**In Re: '639 PATENT LITIGATION**

No. CIV.A.97–12416–RCL.

United States District Court, D. Massachusetts.

Aug. 14, 2001.

———

Thomas Creel, Kaye, Scholer, Firman, Hays and Handlar, LLP, New York City, for Special Master.

Bernard J. Bonn, III, Timothy C. Blank, Kara W. Swanson, Barry S. Pollack, Dechert, Price & Rhoads, Boston, MA, Henry J. Renk, Stevan J. Bosses, Diego, Scambia, Robert L. Baechtold, David F. Ryan, Fitzpatrick, Cella, Harper & Scinto, New York City, for Plaintiffs.

Thomas M. Hemnes, Philip C. Swain, Foley, Hoag & Eliot, Robert J. Muldoon, Jr., Sherin & Lodgen, Boston, MA, John J. Normile, Anthony M. Insogna, Pennie & Edmonds, New York City, Sherin & Lodgen, Boston, MA, Stanton T. Lawrence, Pennie & Edmonds, Washington, DC, Michael A. Albert, Wolf, Greenfield & Sacks, Boston, MA, Steven J. Lee, Elizabeth J. Holland, Frederick H. Rein, Lawrence B. Ebert, Kenyon & Kenyon, New York City, Mark C. Rosenthal, Joshua W. Leichter, Steven N. Farber, Palmer & Dodge, Boston, MA, for Defendants.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

LINDSAY, District Judge.

### I. *Introduction*

This case concerns United States Patent No. 4,420,639 (the "'639 patent"), issued with respect to the chemical compound known as nabumetone to Anthony W. Lake and Carl J. Rose on December 13, 1983 and assigned to Beecham Group, p.l.c. ("Beecham"), one of two plaintiffs herein.[1] Stipulated Facts ¶¶ 6, 82. The '639 patent contains four claims covering nabumetone. Only two of those claims are at issue in this case: claim 2, which recites the compound in solid form; and claim 4, which recites the compound *per se*. *See* Stipulated Facts ¶¶ 7, 84. Since February, 1992, pursuant to its New Drug Application ("NDA") No. 19–583, SmithKline Beecham Corporation ("SmithKline Beecham"), the second plaintiff,[2] has marketed an anti-inflammatory drug product called Relafen, the active ingredient of which is nabumetone. Stipulated Facts ¶¶ 8–10. The defendants, Copley Pharmaceutical, Inc., Teva Pharmaceuticals U.S.A., and Eon Labs Manufacturing, Inc., (the "defendants"), seek to market a generic version of Relafen.

Each of the defendants, pursuant to 21 U.S.C. § 355(j), has filed with the United States Food and Drug Administration

---

1. The original term of the '639 patent was extended for two years. As extended, the patent will expire on December 13, 2002. Stipulated Facts ¶ 82.

2. Throughout this memorandum, the plaintiffs, Beecham and SmithKline Beecham collectively will be referred to as the "plaintiffs."

("FDA") an abbreviated new drug application ("ANDA"), by which each seeks the FDA's approval for the commercial manufacture, use and sale of a drug product containing nabumetone. With its ANDA, each defendant also filed with the FDA a certificate, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), asserting that the '639 patent is invalid (a "Category IV Certification"). The Category IV Certifications for the defendants Copley Pharmaceutical, Inc., and Eon Labs Manufacturing, Inc., also asserted that the '639 patent is unenforceable. Stipulated Facts ¶¶ 11–19.

■■ The defendants each gave written notice ("notice of certification") to Beecham, pursuant to 21 U.S.C. § 355(j)(2)(B)(i) and (ii), that the ANDA and the accompanying certification had been filed with the FDA. In accordance with 21 U.S.C. § 355(j)(2)(B)(ii), the defendants' notices also set forth the legal and factual bases for their claims that the '639 patent is invalid and/or unenforceable. *Id.* With regard to each defendant, within forty-five days of receipt of notice, Beecham, as permitted by 21 U.S.C. § 355(j)(5)(B)(iii), brought suit, together with SmithKline Beecham, to enjoin the infringement of the '639 patent.[3] The three suits have been consolidated for all purposes in the present action. Stipulated Facts ¶ 20.

By way of defenses and counterclaims to the plaintiffs' infringement action, the defendants first claim that the '639 patent is invalid because nabumetone was anticipated by prior art, namely a 1973 article by scientists J.N. Chatterjea and R. Prasad entitled "Condensation of Mannich Base Salts with Phenols: Orientation of Ad-

ducts," published in the *Indian Journal of Chemistry*, Volume 11 at 214–18 (March 1973) (the "Chatterjea & Prasad publication"). The Chatterjea & Prasad publication identified and enabled nabumetone, the defendants argue, and therefore anticipated all claims set forth in the '639 patent, either explicitly or inherently. The defendants claim, in addition, that the '639 patent is unenforceable because Beecham breached its duty of candor to, and engaged in inequitable conduct before, the United States Patent and Trademark Office ("PTO").

On January 20, 1999, I entered an order referring this case to Thomas Creel, as special master, for management of pretrial discovery. In July of 1999, the defendants filed two motions for summary judgment: one on the ground that all claims in the patent were invalid; and the second on the ground that inequitable conduct rendered the patent unenforceable. By order dated November 5, 1999, I referred both motions to special master Creel for a report and recommendation as to the disposition of the issues raised by the motions. On January 31, 2000, the special master issued two reports and recommendations. The first recommended that the defendants' motion for summary judgment, based upon invalidity of all claims, be granted. The second recommended that the defendants' motion for summary judgment of unenforceability, based upon inequitable conduct, be denied because there remained triable issues of fact as to the intent element of the inequitable conduct claim.

After a de novo review of the issues raised by the motions, I issued a memorandum and order on August 16, 2000 that

---

**3.** The filing of an ANDA by a party to obtain approval of the FDA for the marketing of a drug that is the subject of a valid, unexpired patent is a statutory act of infringement. 35 U.S.C. § 271(e)(2)(A); *see also Merck & Co., Inc. v. Biocraft Laboratories, Inc.* 874 F.2d 804, 806 (Fed.Cir.1989), *cert. denied,* 493 U.S. 975, 110 S.Ct. 498, 107 L.Ed.2d 502 (1989).

(1) rejected the special master's recommendation and denied the motion for summary judgment as to invalidity (because the record demonstrated material issues of fact in dispute); and (2) adopted the special master's recommendation and denied the motion for summary judgment on unenforceability. As noted in that order, with regard to the motion for summary judgment on unenforceability, I specifically accepted and adopted the special master's analysis and conclusions.

A non-jury trial of this case commenced on January 8, 2001 and consumed sixteen trial days. Because the defendants bore the burden of overcoming, by clear and convincing evidence, the presumption, under 35 U.S.C. § 282, that the patent was valid and enforceable, I set the order of trial so that the defendants presented their case-in-chief first.

At the close of the defendants' case, the plaintiffs moved for entry of judgment in their favor pursuant to Fed.R.Civ.P. 52(c). After hearing argument, I declined to rule on the plaintiffs' motion. The plaintiffs then presented their case.

## II. *Findings of Background Facts*

### A. *The Parties*

Beecham is a corporation of the United Kingdom and the owner of the '639 patent. Stipulated Facts ¶¶ 2, 6. SmithKline Beecham is a corporation of the Commonwealth of Pennsylvania, and the owner of New Drug Application No. 19–583, pursuant to which it has marketed Relafen in the United States since February, 1992. Stipulated Facts ¶¶ 1, 8–9. The defendants all are corporations of the State of Delaware. Stipulated Facts ¶¶ 3–5.

### B. *Nabumetone*

Nabumetone is the generic name that has been given to the chemical compound at issue in this case. The structure of nabumetone may be indicated in words, using various accepted chemical naming conventions. For example, nabumetone may be validly described either as "Συ–(2–methoxy–6–naphthyl) ethyl methyl ketone" (or, in abbreviated form: "methoxy ketone"); or as "4–(6'–methoxy–2'–naphthyl) butan–2–one." Stipulated Facts ¶¶ 33–34.

### C. *Level of Ordinary Skill in the Art*

The category of art into which the '639 patent falls is that of synthetic organic chemistry. Testimony of Dr. Edward C. Taylor ("Taylor"), Day 1 at 54:18–19; Testimony of Dr. Paul Bartlett ("Bartlett"), Day 15 at 107:3–6. One of ordinary skill in the art of synthetic organic chemistry in 1973 was a person having either a doctoral degree in organic chemistry, primarily synthetic organic chemistry, with a year or two of post-doctoral experience, either industrial or academic; or a masters degree in synthetic organic chemistry with four or five years of industrial experience in that field. Taylor, Day 1 at 89:4–14; Bartlett, Day 15 at 106:14–107:15. The person of ordinary skill in the art in 1973 (sometimes referred to herein as the "ordinary chemist") knew how to conduct standard reactions, such as reduction reactions; reactions named in the Chatterjea & Prasad publication, such as the Grignard reaction;[4] and could apply standard organic chemical methods to the synthesis of simple organic molecules. Taylor, Day 1 at 89:15–90:7. The ordinary chemist in 1973 was familiar with nuclear magnetic resonance ("NMR") spectroscopy, a tool for determining chemical structure. Taylor,

---

4. In the four-step sequence of syntheses at issue in this case, it is the Grignard reaction that converts the nitrile to the ketone.

Day 1 at 90:7–22. The ordinary chemist in 1973 also was familiar with standard chemistry and organic synthesis textbooks, and was able to do a literature search using *Chemical Abstracts,* an index of developments in chemistry periodically published by The American Chemical Society. Taylor, Day 1 at 90:22–91 3; Stipulated Facts ¶ 123. Beecham chemists Drs. Alex Goudie, Ms. Laramie Gaster (later Dr. Laramie Gaster), and Dr. Marta Marton all were persons of ordinary skill in the art in the mid–1970s. Testimony of Dr. Carl Rose ("Rose"), Day 10 at 75:15–77:7.

### D. *The Chatterjea & Prasad publication*

The Chatterjea & Prasad publication was published more than one year prior to the date of Beecham's application in the United States for the '639 patent and was listed in Volume 79 of *Chemical Abstracts.* In that volume of *Chemical Abstracts,* the Chatterjea & Prasad publication was indexed under 4–(6'–methoxy–2'–naphthyl) butan–2–one, one of the chemical names for nabumetone. Stipulated Facts ¶¶ 122–25.

Nabumetone is referenced on two of the five pages in the Chatterjea & Prasad publication. First, at page 215, the article refers to the methyl ether of compound XX, a hydroxy compound; the structure of that methyl ether is that of nabumetone. Second, at page 218, the article provides the chemical name for nabumetone, along with a four-step sequence of chemical reactions that results in nabumetone. Using the abbreviated chemical names for the relevant compounds, the sequence is as follows: (1) methoxy acetate to methoxy ethanol, (2) methoxy ethanol to methoxy bromide, (3) methoxy bromide to methoxy nitrile, and (4) methoxy nitrile to methoxy ketone. Stipulated Facts ¶¶ 126, 128; Exhibit 13 at 215, 218. The Chatterjea &

Prasad publication states that the methoxy ketone was obtained "by Grignard reaction . . . as thick pale yellow oil." Exhibit 13 at 218. It provides no other information about the methoxy ketone, but does list characterizing data for the methoxy ketone derivative (the "2, 4–DNP derivative"). *Id.* There is no indication that Chatterjea and Prasad purified or crystallized the methoxy ketone. Exhibit 13; Rose, Day 11 at 38:20–24.

At page 215, the Chatterjea & Prasad publication sets out a structural proof that includes nabumetone, identified as the methyl ether of compound XX. Chatterjea and Prasad identified two hydroxy compounds: compound XIX and compound XX, the position isomer of compound XIX. A previous paper, by Miller and Robinson, had described the methyl ether of compound XIX. Chatterjea & Prasad proposed to synthesize the methyl ether of compound XX in order to compare it to the methyl ether of compound XIX described by Miller & Robinson. Taylor, Day 1 at 112:1–116:9; Taylor, Day 2 at 12:3–19; Bartlett, Day 15 at 130:1–131:22; Exhibit 13. It is "meaningless" to compare a hydroxy compound to a methoxy compound, and an ordinary chemist would not do so as part of a structural proof. Taylor, Day 2 at 12:8–13; Day 2 at 61:18–62:3; Bartlett, Day 15 at 131:12–17. The authors of the Chatterjea & Prasad publication proposed therefore to compare two methoxy compounds.  ·

The Chatterjea & Prasad publication, as noted above, begins its sequence of chemical reactions with a compound referred to in the article as methoxy acetate. Next to the name of the starting material (methoxy acetate) at page 218 of the Chatterjea & Prasad publication, is footnote 19. Footnote 19 references a 1948 article by R. Jones, et al. entitled, "Byosynthesis of Penicillins. VI. N–2–Hydroxyethylamides

of Some Polycyclic and Heterocyclic Acetic Acids as Precursors," *J. Am. Chem. Soc.*, 70, 2513 (1948) ("Jones," the "Jones article," or "footnote 19"). Exhibit 13 at 218.

### E. *Footnote 19 and the "Jones Error."*

The Jones article referenced in footnote 19 of the Chatterjea & Prasad publication describes a method for synthesizing methoxy acetate. The synthesis is in two basic steps: first, 6–methoxy–2–acetonaphthone is converted to methoxy acid by a Willgerodt reaction; second, methoxy acid is converted to methoxy acetate by a process called esterification. Taylor, Day 2 at 33:16–34:2; Exhibit 15. What came to be known in the present litigation as the "Jones error" arises in the first step of the reaction. A paper by Ormancey and Horeau, published in 1955, reported that, under the conditions set forth in Jones for the Willgerodt reaction, demethylation occurs.[5] Taylor, Day 2 at 34:2–8; Exhibit 21, "Structure Moleculaire et Activite Oestrogene XVI. Influence de la Distance des Groupements Fonctionnels dans la Serie Allenolique" (Molecular Structure and Estrogenic Activity XVI. Influence of the Distance of the Functional Groups in the Allenolic Series), *Bull. Chim. Soc. Franc.*, pages 962–69 (1955) ("Ormancey"). As a result of the demethylation, hydroxy acid, rather than methoxy acid, is created. *Id.* The second step of the Jones synthesis, the esterification of the acid to form the acetate, works. Taylor, Day 2 at 96:7–15. However, if the result of the first step in Jones were hydroxy acid, the result of the second stop in Jones would be hydroxy acetate, rather than methoxy acetate. The plaintiffs argue that the ordinary chemist, knowing of the Jones error, would understand the Chatterjea & Prasad publication to teach a series of hydroxy compounds, concluding with a hydroxy ketone rather than a methoxy ketone.

### F. *The '639 Patent Prosecution History and Related Events at Beecham.*

The '639 patent issued from the last of a chain of six United States patent applications. Beecham was represented in this prosecution by the firm of Jacobs & Jacobs, working with Beecham's in-house Patent Department in the United Kingdom. Stipulated Facts ¶ 86.

#### 1. *Beecham Research Leading to the Initial Patent Application.*

The series of patent applications that led to the '639 patent grew out of research that began with Beecham's anti-inflammatory group, a research unit focused in part on non-steroidal anti-inflammatory drugs ("NSAIDs"). NSAIDs are used in the treatment of certain diseases characterized by inflammation, especially arthritis. Rose, Day 11 at 77:7–12. Dr. Carl Rose was a member of Beecham's anti-inflammatory group from 1970 to 1975.[6] Rose, Day 11 at 76:15–18. He conceived the structure of nabumetone no earlier than July 1973, and, under his direction, Zoe Slattery, a laboratory technician, synthesized nabumetone no later than October, 1973. Stipulated Facts ¶ 149; Rose, Day 11 at 52:15–22.

#### 2. *The '773 and '159 Applications*

##### a. *Beecham's Interactions with the PTO*

On August 29, 1974, Beecham filed a patent application in the PTO which was

---

5. Demethylation is the stripping of the methyl group from the acid. Taylor, Day 2 at 34:2–15.

6. Dr. Rose then became a member of Beecham's Chemical Development Department, where he remained until 1996. Rose, Day 11 at 76:20–23.

given the Serial Number 501,773 ("the '773 application"). The '773 application listed Anthony W. Lake and Carl J. Rose, both Beecham employees, as inventors, and was assigned to PTO Examiner James Reamer. Stipulated Facts ¶ 88. The '773 application contained twenty-two claims, including a claim for the compound nabumetone. Examiner Reamer issued a restriction requirement obligating Beecham to elect which of the claimed inventions it would prosecute. Stipulated Facts ¶¶ 90–91. Beecham chose the compound of claim 20, nabumetone. *Id.*

On March 28, 1975, Beecham filed a divisional application, Serial Number 563,-159 ("the '159 application"), which was directed to certain of the unelected claims in the '773 application. The '159 application was assigned to PTO Examiner Stanley Friedman. Stipulated Facts ¶ 92. On or about April 29, 1975, examiner Reamer issued a final office action in the '773 application, rejecting claim 20 (nabumetone) as obvious over the 1955 Ormancey article, which, among other things, discloses a homolog of nabumetone. Exhibit 3 at 101–03. Stipulated Facts ¶ 93.

On August 21, 1975, Beecham filed a continuation of the '773 application, which was given the Serial Number 606,411 ("the '411 application"), and assigned to examiner Reamer. Claim 23 of the '411 application was the compound nabumetone *per se.* Exhibit 11 at 61 (Bates Stamp page number 185004). Stipulated Facts ¶ 95. The '411 application mentioned the Chatterjea & Prasad publication, but asserted that compound XIX, a hydroxy compound discussed in the article, was the compound "most pertinent" to the issue raised by the '411 application. Exhibit 11 at 63 (Bates Stamp page number 185006). It does not appear that Beecham provided the PTO with a copy of the Chatterjea &

Prasad publication in the '411 application. On December 8, 1976, Beecham filed a continuation-in-part application of the '159 application. The continuation-in-part application was given the Serial Number 748,676 ("the '676 application"). The '676 application was assigned to examiner Friedman. Stipulated Facts ¶ 96; Exhibit 5 at 14, 73. Beecham then abandoned the '773 and '159 applications. Stipulated Facts ¶¶ 97–98.

b. *Beecham's Internal Communications, Research, and Correspondence*

By late 1974 or early January 1975, someone in Beecham's anti-inflammatory group discovered the Chatterjea & Prasad publication in *Chemical Abstracts.* Stipulated Facts ¶ 151. Dr. Rose first became aware of the Chatterjea & Prasad publication on approximately January 2, 1975, the date of a memorandum from Dr. David Miller, his supervisor in the anti-inflammatory group, to Dr. Gwyn Cole, a member of Beecham's Patent Department. Rose, Day 10 at 56:1–57:11; Exhibit 94.[7] That memorandum stated that nabumetone "is not the unique Beecham compound we thought it was." Exhibit 94.

Dr. Rose testified that from January 1975 to the fall of 1976, it was "taken for granted" at Beecham that the Chatterjea & Prasad publication had named nabumetone, and it was thought that Beecham could not get patent protection for the compound because of the Chatterjea & Prasad publication. Rose, Day 10 at 72:10–21. A report from Beecham's anti-inflammatory group dated January 20, 1975 and authored by Dr. David Miller states: "The original [Chatterjea & Prasad] publication pre-dated our patent application and hence we have a case of prior

7. Dr. Cole was also a chemist. Rose, Day 10    at 83:1–2.

disclosure." Exhibit 96 at 4; Rose, Day 10 at 73:20–74:20. More than a year later, an anti-inflammatory group report dated February 1976 similarly stated: "The compound is old, and so no claims to [nabumetone] per se or its preparation can be obtained." Exhibit 123 at 2. The same language appeared in an anti-inflammatory group report dated May 1976. Exhibit 133 at 3. According to Dr. Rose, the Beecham Patent Department, which included a number of "ex-chemists," also believed that nabumetone had been named by Chatterjea & Prasad. Rose, Day 10 at 82:16–25.

A memorandum dated March 8, 1976 from Dr. Goudie and Ms. Gaster to Dr. Rose and others identified the Chatterjea & Prasad publication as the "existing literature procedure" for synthesizing nabumetone. Rose, Day 10 at 77:17–81:11; Exhibit 127 at 1. The memorandum states: "The starting ester is readily available." Exhibit 127 at 1. The starting ester to which they referred is the methoxy acetate, and it was readily accessible by research in the literature by 1973 (and necessarily by 1976, when the memorandum was written). Rose, Day 10 at 81:12–82:15.

At some point during 1976, Drs. Miller and Rose transferred to the Chemical Development Department. Dr. Miller, however, remained Dr. Rose's supervisor. Dr. Rose supervised Dr. Marton, who was asked to repeat the Chatterjea & Prasad publication's route to nabumetone. Rose, Day 10 at 84:21–85:15. Dr. Marton began with methoxy acid, which she converted to methoxy acetate, citing the Jones article for the esterification procedure. Rose, Day 10 at 86:15–87:13; Exhibit 427 at 17.

In the fall of 1976, Dr. Rose made solid, crystalline nabumetone, starting with authentic methoxy acetate and proceeding through the intermediates, methoxy ethanol, methoxy bromide and methoxy nitrile. Stipulated Facts ¶ 155. Using NMR spectroscopy, Dr. Rose confirmed at each stage of his 1976 synthesis that he had made the intended compounds. Stipulated Facts ¶ 156. Before it was crystallized, the nabumetone that Dr. Rose had synthesized appeared as a "semi-solid." Exhibit 37 at 46. After his experiments, Dr. Rose submitted a sample of methoxy nitrile for testing at Beecham on October 22, 1976, using a Beecham biological testing form. On that form he indicated that the source of the material was the Chatterjea & Prasad publication. Rose, Day 10 at 111:23–113:14; Exhibit 156.

In a memorandum to the Beecham Patent Department dated November 2, 1976, captioned with the title of the Chatterjea & Prasad publication, Dr. Rose stated that he had prepared nabumetone "following the published methods as closely as detail would allow." Rose, Day 10 at 95:10–96:12; Exhibit 484 at 1. In the experiment that he reported, however, he did not rely on Jones as the source for deriving the starting material, methoxy acetate. Rose, Day 10 at 98:15–22. In a second memorandum to the Beecham Patent Department dated November 5, 1976, Dr. Rose also reported that the first step in the "published route" to nabumetone (the Chatterjea & Prasad publication) is the conversion of methoxy acetate to methoxy ethanol. Rose, Day 10 at 101:15–103:16; Exhibit 483. Similarly, a report of the Beecham Chemical Development Department dated November 3, 1976 described the research done by Drs. Marton and Rose, and explained that "[a] preparation of [nabumetone] using the published route of Chatterjea and Prasad was requested by the Patent Department." Rose, Day 10 at 104:4–105:25; Exhibit 160 at 6. A Beecham internal report of "New Product Development" for the period October to December 1976 also states plainly that "[t]he route of [the Chatterjea & Prasad publica-

tion] is based on the reduction of methyl (6–methoxy–2–naphthyl) acetate [methoxy acetate] ...," making no mention of the Jones reference. Rose, Day 10 at 110:19–111:18; Exhibit 430 at 29.

Also in 1976, Dr. Rose attempted to synthesize the hydroxy series of compounds, but was never able to synthesize the hydroxy ketone using the Grignard reaction set forth in the Chatterjea & Prasad publication. The only way he was able to make the hydroxy ketone was to demethylate nabumetone. Rose, Day 11 at 50:18–51:10.

### 3. The '676, '411 and '119 Applications

#### a. Beecham's Interactions with the PTO

The '676 application, dated December 8, 1976, contained claims directed to pharmaceutical compositions for nabumetone and methods of treatment with nabumetone. The '676 application also contained claim 8, solid nabumetone having a melting point of not less than 78.5° C. Stipulated Facts ¶ 99; Exhibit 5 at 67. In addition, the application contained new language, added by Beecham, that was not present in the earlier applications:

> J.N. Chatterjea and R. Prasad (Indian J. Chem., 1973 214–8) reported the preparation of a compound which they thought to be [nabumetone]. However the compound they reported was an oil whereas we have found that [nabumetone] is a solid when pharmaceutically pure. We have also found that crystalline [nabumetone] may be prepared.

Stipulated Facts ¶ 100; Exhibit 5 at 18. The '676 application also contained "Example 19," which set forth a four-step synthe-sis of nabumetone beginning with methoxy acetate. Stipulated Facts ¶ 100; Exhibit 5 at 53–54. The synthetic route described in Example 19 involves the same compounds, reactants and reagents named at page 218 of the Chatterjea & Prasad publication. Stipulated Facts ¶ 161. Example 19 enables one of ordinary skill in the art to make nabumetone starting with methoxy acetate. Stipulated Facts ¶ 152. As Dr. Taylor testified, "Example 19 ... and the Chatterjea & Prasad named route ... are identical." Taylor, Day 1 at 111:6–8.

On February 14, 1977, Beecham provided the PTO with a copy of the Chatterjea & Prasad publication, but referred the examiner to the hydroxy analog of nabumetone (compound XX), and not to nabumetone itself (the methyl ether of compound XX). Exhibit 11 at 140, 144 (Bates Stamp page number 185081, 185085). On March 4, 1977, Beecham disclosed to the PTO that the Chatterjea & Prasad publication named nabumetone, but told the PTO that it did not believe there was "a sufficient enabling disclosure in that brief description in the reference to enable one of ordinary skill in the art to produce the compound." Exhibit 11 at 138 (Bates Stamp page number 185079).

In response to a restriction requirement made by examiner Friedman, Beecham elected to prosecute the pharmaceutical composition and method-of-treatment claims in the '676 application, but filed a divisional application, Serial Number 795,-119, to continue prosecuting claim 8, nabumetone in solid form ("the '119 application").[8] The '119 application was filed on May 9, 1977, and was assigned to examiner Reamer. Stipulated Facts ¶¶ 101, 105.

---

**8.** The pharmaceutical composition and method-of-treatment claims were allowed in the '676 application, resulting in the issuance of Patent Number 4,061,779 ("the '779 pat-ent") on December 6, 1977. The '779 patent expired on December 6, 1994. Stipulated Facts ¶¶ 103–04.

Beecham then abandoned the '411 application. Stipulated Facts ¶ 102.

On March 13, 1978, Beecham filed an amendment to the '119 application, adding the following compound claims: nabumetone in solid form; and crystalline nabumetone with a melting point of approximately 80°C. Stipulated Facts ¶ 106; Exhibit 6 at 67. In the amendment, Beecham also told the PTO that Chatterjea and Prasad "obtained a thick, pale yellow oil having a melting point of 184° to 186°. Duplication of the Chatterjea disclosure confirms the fact that Chatterjea, et al. did not obtain the 6–methoxy compound of the instant case, but rather obtained the *6–hydroxy* compound." Exhibit 6 at 68 (emphasis in original).

On October 27, 1978, Beecham filed a continuation application, Serial Number 955,197 ("the '197 application"), containing the same three claims to nabumetone as in the '119 application. Exhibit 7 at 5, 65. The '197 application was assigned to examiner Reamer. Beecham then abandoned the '119 application. Stipulated Facts ¶¶ 107–08.

b. *Beecham's Internal Communications, Research, and Correspondence*

In an October 17, 1977 letter, G.D. Meikle, a member of the Beecham Patent Department, advised Beecham's Canadian patent agents that: "[S]ubmitting affidavit evidence that the Chatterjea and Prasad paper contains inoperative information does not seem to be possible." Exhibit 197 at 1.

On June 6, 1978, the *Journal of Medicinal Chemistry* published an article written by then-Beecham employees Drs. Rose, Lake, Miller and Goudie, entitled, "4–(6–Methoxy–2–naphthyl) butan–2–one and Related Analogs, a New Class of Anti-inflammatory Compounds" (the "Goudie paper"). Stipulated Facts ¶ 153; Exhibit 17. One of the synthetic routes set forth in the Goudie paper is the same as the route set forth in Example 19. Stipulated Facts ¶ 154.

On June 8, 1978,[9] Dr. Rose attempted to create hydroxy ketone from hydroxy nitrile using the Grignard reaction. The Grignard solvents he employed were a mixture of diethyl ether, benzene and tetrahydrofuran ("THF"). The experiment was unsuccessful, and Dr. Rose did not repeat it. Rose, Day 12 at 76:20–77:15; Exhibit 176 at 31.

Dr. Rose's laboratory notebook also shows that from July 4–7, 1978, he performed a second set of methoxy series experiments, which he termed "Preparation of [Nabumetone] Literature Method." Exhibit 176 at 40–41. In that set of experiments, he began with authentic methoxy ethanol and proceeded through the intermediates methoxy bromide and methoxy nitrile to synthesize methoxy ketone (nabumetone). Rose Day 11 at 11:13–12:3; Exhibit 176 at 40–41; Stipulated Facts ¶ 157. Using NMR spectroscopy, Dr. Rose confirmed at each stage of his 1978 synthesis that he had made the intended compounds. Stipulated Facts ¶ 158. He reported in his laboratory notebook that he produced nabumetone as "an oil ... which solidified." Exhibit 176 at 41. On July 13, 1978, Dr. Rose sent to Dr. Cole of Beecham's Patent Department a memorandum in which Dr. Rose stated that he had "repeated the preparation of [nabumetone] using the route reported by Chatterjea & Prasad." Rose, Day 11 at 9:2–17; Exhibit 223. The memorandum also comments that "if [nabumetone] is in the oil

---

**9.** Dr. Rose's laboratory entry actually reads "July 8," but he testified that he believed the experiments took place on June 8. Rose, Day 12 at 86:8–16.

prepared by the authors [Chatterjea & Prasad] at all, it must be present in a low proportion." Exhibit 223.

### 4. The '197 Application

#### a. Beecham's Interactions with the PTO

As stated above, the '197 application was filed on October 27, 1978. In an office action dated January 24, 1979, examiner Reamer rejected the three claims of nabumetone contained in the '197 application over the Chatterjea & Prasad publication. Exhibit 7 at 66–68; Stipulated Facts ¶ 109. On April 23, 1979, Beecham filed an amendment to the '197 application, arguing in favor of the three claims. The amendment was accompanied by a declaration from Dr. Rose dated March 16, 1979 (the "First Rose Declaration"). Exhibit 7 at 96; Exhibit 33; Stipulated Facts ¶ 110. The First Rose Declaration stated that Dr. Rose had "attempted to follow the directions set forth at page 218" of the Chatterjea & Prasad publication for the preparation of nabumetone, but that he had "diverged from the described processes in that [he] purified the compounds carefully at each stage." Exhibit 33 at 2, ¶ 5. Beecham's patent attorneys represented to the PTO that this was Dr. Rose's only divergence from the process outlined in the Chatterjea & Prasad publication; Dr. Rose agreed with this characterization. Exhibit 7 at 93; Rose, Day 11 at 32:2–15. The First Rose Declaration provided a table comparing the melting points noted in Dr. Rose's methoxy series with those reported in the Chatterjea & Prasad publication. For his own preparation of nabumetone, Dr. Rose listed a melting point of 80°C; for that of the Chatterjea & Prasad publication, he listed "oil." Exhibit 33 at 5, ¶ 7.

Examiner Reamer again rejected the three claims in the '197 application in a May 25, 1979 office action. Exhibit 7 at 102–03; Stipulated Facts ¶ 111. Beecham appealed to the PTO's Board of Appeals on December 20, 1979. On September 15, 1981, the Board of Appeals affirmed examiner Reamer's decision. Exhibit 7 at 119–125, 135–41. Stipulated Facts ¶¶ 112–115.

#### b. Beecham's Internal Communications, Research, and Correspondence

An October 14, 1981 Beecham Patent Department memorandum, written to Beecham's Mr. E.R. Stove by Mr. H.B. Dawson, states: "The Beecham evidence [presented to the PTO] in relation to Chatterjea was in the form of Declarations by Drs. Rose and Miller ... showing by means of a repetition of the Chatterjea process that Chatterjea did not obtain [nabumetone] and arguing that it was not obvious to repeat Chatterjea (a necessary argument as it seems that repeating Chatterjea using correct techniques *does* give [nabumetone])." Exhibit 263 at 1–2 (emphasis in original). In this memorandum, Mr. Dawson requested the assistance of the Beecham "special projects unit," a group of chemists who performed chemical investigations at the request of Beecham's management. Exhibit 263; Testimony of Dr. Richard K. Anderson ("Anderson"), Day 4, at 113:6–12.

As a result of this request, Dr. Richard K. Anderson became involved in investigating the Chatterjea & Prasad publication. Anderson, Day 4 at 114:9–15. Dr. Anderson was a member of the special projects unit. Anderson, Day 4, at 112:22–25. The goal of Dr. Anderson's investigation was to prove Beecham's hypothesis that Chatterjea and Prasad actually had described hydroxy, rather than methoxy, compounds (the "hydroxy hypothesis"). Anderson, Day 5 at 8:10–9:8.

In a preliminary progress report dated October 22, 1981, Dr. Anderson raised a

potential problem with the hydroxy hypothesis, namely that it was not known whether the Willgerodt reaction outlined in Jones would completely demethylate the compound. If demethylation were not complete, then some authentic methoxy acid might be formed. Anderson, Day 5 at 14:21–15:17; 16:12–19; Exhibit 270 at 4.

### 5. The '190 Application

#### a. Beecham's Interactions with the PTO

Beecham filed a continuation application on November 12, 1981, Serial Number 320,190 ("the '190 application"). Stipulated Facts ¶ 116; Exhibit 8 at 3. The '190 application contained the three claims to nabumetone in solid form that had been contained in the rejected '197 application. On February 16, 1982, Beecham amended the '190 application by adding claim 11, a claim for the compound nabumetone *per se*. Stipulated Facts ¶ 117; Exhibit 8 at 64–65. On November 2, 1982, in the '190 application, examiner Reamer issued a final rejection of the three claims to nabumetone in solid form, as obvious over the Chatterjea & Prasad publication under 35 U.S.C. § 103; and of claim 11, as anticipated by the Chatterjea & Prasad publication under 35 U.S.C. § 102. Stipulated Facts ¶ 118; Exhibit 8 at 79–81.

On May 3, 1983, Beecham filed a response to the final rejection. That response included an April 20, 1983 declaration of Dr. Rose (the "Second Rose Declaration") and a November 5, 1982 affidavit of Dr. Anderson (the "Anderson Affidavit"). Stipulated Facts ¶ 119; Exhibit 8 at 84, 345, 369; Exhibit 34; Exhibit 349. Beecham knew, as of the date of the Anderson Affidavit, that pure hydroxy ketone is a solid with a melting point of approximately 120°C. Stipulated Facts ¶ 162. Beecham's May 3, 1983 response informed the PTO that, at Beecham's request, Dr. Chatterjea had become involved in "reinvestigating" the Chatterjea & Prasad publication, because "according to Beecham's repetition of the Chatterjea/Prasad route, the 2–methoxy compound could not be produced." Exhibit 8 at 89–90. Beecham told the PTO that Dr. Chatterjea "took a fresh look at the synthesis with particular emphasis on the preparation of the starting material," and provided an affidavit from Dr. Chatterjea stating that he had "replicated the Chatterjea/Prasad synthesis and obtained a product which was ... the 2, 4–DNP derivative of the. ... 2–hydroxy compound." *Id.* at 91, 97.

On June 9, 1983, the examiner reversed his original rejection of the three claims of the '190 application and allowed these claims. The PTO issued the '639 patent on December 13, 1983. Stipulated Facts ¶ 120; Exhibit 1; Exhibit 8 at 416–38.

#### b. Beecham's Internal Communications, Research, and Correspondence

In total, Dr. Anderson attempted to complete the four-step synthesis using hydroxy compounds five times. On November 19–20, 1981, his first two attempts at the Grignard reaction, using only diethyl ether as a solvent, failed to convert the hydroxy nitrile to hydroxy ketone. Anderson, Day 5 at 61:8–15; Exhibit 801; Exhibit 36 at 49–51. On November 24, 1981, Dr. Anderson sent a memorandum to the Beecham Patent Department reporting his findings to date. In that memorandum he stated that the hydroxy ketone had not yet been prepared from the hydroxy nitrile. Instead, to check the melting point of the ketone reported in the Chatterjea & Prasad publication, Dr. Anderson was planning to demethylate a sample of nabumetone. Anderson, Day 5 at 64:18–66:13; Exhibit 290 at 1. As of December,

1981, Beecham had not yet repeated the four-step synthesis outlined in the Chatterjea & Prasad publication using hydroxy compounds. Anderson, Day 5 at 68:11–20; Day 9 at 61:6–15; Exhibit 250 at 1; Exhibit 294 at 1.

On December 8, 1981, at Beecham's request, Dr. Chatterjea sent to Beecham a sample of the methoxy nitrile that he had been able to "salvage" from the original experiment that led to the Chatterjea & Prasad publication. Exhibit 295; Exhibit 297 at 1. Dr. Anderson arranged for various analyses to be made of the sample received from Dr. Chatterjea. The results of these analyses, reported in a memorandum from Dr. Anderson to Mr. Stott of the Beecham Patent Department dated January 14, 1982, showed that the sample in fact consisted of 70–75% methoxy nitrile. Anderson, Day 9 at 63:11–22; Exhibit 305.

In Dr. Anderson's third, fourth and fifth attempts to complete the four-step hydroxy synthesis, he used a combination of THF and benzene for the Grignard reaction in the conversion of the nitrile to the ketone, and was able to make the reaction proceed. Anderson, Day 6 at 22:3–15, 26:23–27:10. Dr. Anderson ran his third Grignard reaction in the hydroxy series of compounds on December 15, 1981. Anderson, Day 6 at 8:17–15:8; Exhibit 36 at 62–63; Exhibit 802. He described the product of the third reaction as a "thick yellow brown oil [that] gradually solidified." Exhibit 36 at 63.

In a memorandum to Mr. F.P. Doyle dated January 26, 1982, Mr. Stott stated: "There now appears to be only one course of action remaining in our attempt to secure valid compound protection for [nabumetone] in the States, namely to argue that the Chatterjea publication is not an enabling prior publication. Thus, while we cannot deny the actual disclosure of [nabumetone], we can show that the disclosed synthesis does not lead to the compound." Exhibit 309 at 2.

From February 11 to 18, 1982, Dr. Anderson worked on his fourth Grignard reaction in the hydroxy series of compounds. Anderson, Day 6 at 15:9–19:8; Exhibit 36 at 84–87; Exhibit 802. He described the product of that fourth reaction as a "free-running liquid." Anderson, Day 6 at 19:16–19; Exhibit 36 at 87.

In early 1982, Dr. Anderson also synthesized the methoxy series of compounds, starting with authentic methoxy acetate and proceeding through the intermediates methoxy ethanol, methoxy bromide and methoxy nitrile. On March 25, 1982, he reported obtaining methoxy ketone, which he described as a "pale brown oil [that] solidified." From that product, Dr. Anderson made solid, crystalline nabumetone. Stipulated Facts ¶ 159; Anderson, Day 7 at 7:11–18; Exhibit 36 at 91. Using NMR spectroscopy, Dr. Anderson confirmed at each stage of his synthesis that he had made the intended compounds. Stipulated Facts ¶ 160.

Also in the spring of 1982, Beecham corresponded with Dr. Chatterjea. After receiving a letter from Mr. Stott on March 12, 1982, stating that Beecham was "still unable to reproduce the results that are given in" the Chatterjea & Prasad publication (Exhibit 319 at 1), Dr. Chatterjea responded on March 27, 1982, that he was "surprised at [Beecham's] inability to reproduce the work along the lines suggested in [his] original paper," and promised to take a "fresh look at the problem." Exhibit 323. On June 21, 1982, Dr. Chatterjea again wrote to Mr. Stott, informing him that he had taken a "fresh look" at the issue, and had repeated the synthetic route described in the Chatterjea & Prasad publication "with care." Exhibit 331 at 1. Dr. Chatterjea reported: "[O]ur work stands verified.... [W]e synthesized the methyl

ketone." *Id.* at 1–2. On July 6, 1982, Mr. Stove responded to Dr. Chatterjea, thanking him for his results, but asking him to perform the reaction sequence again "because the U.S. Patent Office want [sic] to know what happens when 2–acetyl–6–methoxynaphthalene is subjected to the Willgerodt reaction exactly as described by Jones ... and the product of this reaction is esterified according to Jones and then put through the ... reaction sequence you describe in [the Chatterjea & Prasad publication]." Exhibit 333 at 1. A July 26, 1982 cable from Mr. Stove to Dr. Chatterjea reiterated the request to perform the reaction sequence "following the reported procedures *exactly* as described [in Jones];" in other words, Mr. Stove wrote, "you should disregard the composition of the ester obtained following Jones and submit this product to the subsequent steps reported in your paper." Mr. Stove stated that this might "seem artificial," but insisted that it was "required" by the PTO. Exhibit 335 (emphasis in original).

From October 6 to 8, 1982, Dr. Anderson worked on his fifth Grignard reaction in the hydroxy series of compounds. Anderson, Day 6 at 21:12–26:22; Exhibit 358 at 68–70. He described the product of that fifth reaction as a "thick yellow oil that gradually solidified." Exhibit 358 at 70.

On June 3, 1983, after the '639 patent was granted, Mr. Stott authored a memorandum to Beecham's Dr. K.R.L. Mansford that stated: "All the claims including the unrestricted compound claim have been allowed. The Examiner's decision is completely unexpected.... It would appear that this is the first time a patent has been allowed in the U.S.A. for a compound that is described in the prior art under these circumstances." Exhibit 373.

## G. *The Defendants' Claim that Beecham Intentionally Misled the PTO.*

As noted above, I accepted, after de novo review, the findings of the special master that two statements made to the PTO by Beecham, in the course of the patent application process, were material misrepresentations. I now affirm that determination after hearing all the evidence. Each of the two statements was made in an affidavit.

The first statement is contained in the Second Rose Declaration, submitted to the PTO on May 3, 1983 as part of Beecham's response to the PTO's final rejection of the '190 application. In paragraph 5 of that document, Dr. Rose incorrectly represented that: (1) he was able to synthesize nabumetone successfully by following the Chatterjea & Prasad publication only because he fortuitously had methoxy acid, and did not need to synthesize it; (2) had he not been in such an "unusual position," he would have been "obliged" to utilize the Jones reference to obtain the methoxy acetate starting material; and (3) "any independent expert" likewise would have been "obliged" to use the Jones synthesis because the "free acid [methoxy acid from which methoxy acetate is derived by the process of esterification] was not, and still is not, generally available." Exhibit 34 at 4.

The second statement is contained in the Anderson Affidavit, also submitted by Beecham to the PTO on May 2, 1983. The Anderson Affidavit incorrectly represented that the melting point of hydroxy ketone was "oil." Exhibit 349 at Appendix 4.

The defendants argue that these material misrepresentations were made with the intention to mislead the PTO and persuade the examiner to issue a patent for nabumetone. The defendants argue that there is a substantial likelihood that a patent examiner, reviewing the application in light of

the sworn statements from Drs. Rose and Anderson, would have considered their misrepresentations important to the patentability issues of identity and enablement with respect to nabumetone. I agree.

The November 2, 1982 rejection of the '190 application had been based in part on reasoning that the claims of the '190 application were obvious in light of and anticipated by the Chatterjea & Prasad publication. The sworn statements of Drs. Rose and Anderson were submitted to persuade the PTO of the contrary view.

The defendants also presented evidence of other inconsistencies between the materials presented to the PTO by Beecham and Beecham's internal documents, including research reports and correspondence. Part of this evidence has been set forth above; other portions will be described in the sections that follow.

### III. Conclusions of Law and Ultimate Findings

#### A. Invalidity

■ The '639 patent enjoys a statutory presumption of validity and enforceability. 35 U.S.C. § 282. However, an invention is not novel, and therefore not patentable, if a prior art reference discloses every element of the asserted invention. See Lewmar Marine Inc. v. Barient, Inc., 827 F.2d 744, 747 (Fed.Cir. 1987), cert. denied, 484 U.S. 1007, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988). Under 35 U.S.C. § 102(b), if an invention "was ... described in a printed publication in this or another country ... more than one year prior to the date of application for patent in the United States," it has been anticipated and is therefore not entitled to a patent.

The parties in this case do not dispute that the Chatterjea & Prasad publication meets the requirement that the prior art reference be a publication printed more than one year prior to the date of the relevant application. The dispute at trial centered on whether the Chatterjea & Prasad publication adequately "describes" the '639 patent.

■ The plaintiffs argue that deference is due to the PTO's decision to issue the '639 patent. It is true, of course, that a "presumption of validity ... is accorded to issued patents under 35 U.S.C. § 282." Purdue Pharma L.P. v. Faulding Inc., 230 F.3d 1320, 1329 (Fed.Cir.2000). But it is also true that the defendants' burden, to prove invalidity by "clear and convincing evidence," is "constant and never changes." American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1360 (Fed.Cir.1984), cert. denied, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Thus, the deference owed to the PTO's issuance of a patent does not increase the burden of a party challenging the patent's validity. See id. As the American Hoist court stated, "the production of ... invalidating evidence not before the PTO ... eliminate[s], or at least reduce[s], the element of deference due the PTO, thereby partially, if not wholly, discharging the attacker's burden, but neither shifting nor lightening it or changing the standard of proof." Id. (emphasis in original).

■ Several factors in this case cancel the deference ordinarily due to a PTO decision. First, as I have already determined, material misrepresentations were made to the PTO. Thus, the PTO's decision was based at least in part on incorrect information. Second, evidence was offered at trial that was not before the PTO, including research, internal communications and other correspondence. That evidence casts doubt on other of Beecham's representations to the PTO. As the court held in American Hoist, "[d]eference is due the Patent and Trademark Office decision to

issue the patent with respect to evidence bearing on validity which it considered but no such deference is due with respect to evidence it did not consider." *Id.See also Purdue, supra,* 230 F.3d at 1329. For these reasons, I decline to defer to the PTO's determination with regard to the '639 patent.

The burden remains on the defendants, however, to prove the claim of invalidity by clear and convincing evidence. "The 'clear and convincing' standard of proof...is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.'" *Buildex Incorporated v. Kason Industries, Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988) (quoting *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). "Although not susceptible to precise definition, 'clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions [is] highly probable.'" *Id.* (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)). *See also Price v. Symsek,* 988 F.2d 1187, 1191 (Fed.Cir. 1993).

To establish invalidity of the '639 patent by reason of anticipation by a prior art reference, the defendants must demonstrate both identity of invention and enablement by the prior art reference. *See, e.g., Helifix Ltd. v. Blok–Lok, Ltd.,* 208 F.3d 1339, 1346 (Fed.Cir.2000) ("[t]o be anticipating, a prior art reference must disclose 'each and every limitation of the claimed invention[,] ... must be enabling[,] and [must] describe ... [the] claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention'") (quoting *In re Paulsen,* 30 F.3d 1475, 1478–79 (Fed.Cir.1994)); *General Electric Co. v. Nintendo Co., Ltd.,* 179 F.3d 1350, 1356–57 (Fed.Cir.1999) ("[t]o anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter") (quoting *PPG Industries, Inc. v. Guardian Industries Corp.,* 75 F.3d 1558, 1566 (Fed.Cir.1996)).

Identity of invention requires that a prior reference disclose to one of ordinary skill in the art all elements and limitations of the patent claim. *See Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991). For a prior art reference to "enable" the invention of a patent, the reference must place the invention in the possession of the public by enabling others to practice the invention. *See In re Donohue,* 766 F.2d 531, 533 (Fed.Cir.1985) ("*Donohue II*"). "Such possession is effected if one of ordinary skill in the art could have combined the publication's description of the invention with his own knowledge to make the claimed invention." *Id.*

Notably, "anticipation does not require actual performance of suggestions in a disclosure. Rather anticipation only requires that those suggestions be enabling to one of skill in the art." *Bristol–Myers Squibb Co. v. Ben Venue Laboratories, Inc.,* 246 F.3d 1368, 1379 (Fed.Cir.2001). *See also Donohue II, supra,* 766 F.2d at 533 (it is not "necessary that an invention disclosed in a publication shall actually have been made in order to satisfy the enablement requirement"). Indeed, even "[a]n inoperable invention or one which fails to achieve its intended result does not negate novelty." *Bristol–Myers, supra,* 246 F.3d at 1377 (quoting *U.S. v. Adams,* 383 U.S. 39, 50, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966)).

A reference that requires experimentation by one skilled in the art is

nevertheless anticipatory so long as the experimentation is not "undue." The determination of what constitutes undue experimentation requires the application of a standard of reasonableness, taking into account the nature of the invention and the state of the art. *In re Wands,* 858 F.2d 731, 736–37 (Fed.Cir.1988). "[A] considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed." *Id.*

■■■■ The use of additional references to establish that the anticipatory reference is enabling is legally permissible under Section 102. *Bristol–Myers, supra,* 246 F.3d at 1379; *Donohue II, supra,* 766 F.2d at 534; *Application of Samour,* 571 F.2d 559, 562–63 (Cust. 7 Pat.App.1978). The law of enablement presumes one acts with common sense and allows one skilled in the art to use commercially available, or otherwise known or readily available materials reported in the prior art, as starting points. *See Bruning v. Hirose,* 161 F.3d 681, 686 (Fed.Cir.1998); *Application of Brebner,* 59 C.C.P.A. 897, 455 F.2d 1402, 1404 (Cust. & Pat.App.1972) ("a rejection for failure to enable because of failure to disclose how to obtain starting materials would be sustainable only if the method of obtaining them would not be apparent to one of ordinary skill in the art"); *Ex parte Thomson,* 24 U.S.P.Q.2d 1618, 1620 (1992). As stated in *Donohue II, supra,* "possession of the public" occurs when the ordinarily skilled person's own knowledge, combined with the publication's description, enables that person to make the invention, but the invention in the publication need not have been actually made. 766 F.2d at 533.

■■■■ There is no dispute that the Chatterjea & Prasad publication literally states the chemical name for what is now called nabumetone: "Συ–(2–methoxy–6–naphthyl) ethyl methyl ketone," and describes a process by which this compound may be synthesized from other compounds. Taken alone, the chemical name for nabumetone and the description of a method for deriving it would be sufficient to establish identity of the compound named in the Chatterjea & Prasad publication with the compound named in the '639 patent. *See Donohue II, supra; Samour, supra.*

The position taken by the plaintiffs at trial was that, because of the "Jones error," the person of ordinary skill in the art would have understood the Chatterjea & Prasad publication to describe only hydroxy compounds and that therefore, the Chatterjea & Prasad publication fails to *identify* nabumetone.

1. *Identification*

Although Drs. Rose and Anderson, and the plaintiffs' witness Dr. Paul Bartlett, an expert in synthetic organic chemistry, now argue that the Chatterjea & Prasad publication does not identify nabumetone to the ordinary chemist, I reject that conclusion in light of other evidence to the contrary in the record. Of especial significance is the fact that all of the Beecham chemists confronted with the Chatterjea & Prasad publication during the relevant time period— including Drs. Rose, Anderson, Marton, Goudie, Miller, Cole and Ms. Gaster—initially believed the article to have identified nabumetone. Dr. Rose testified that when he first read the Chatterjea & Prasad publication, in 1975, he believed that it described nabumetone and not a hydroxy ketone. Rose, Day 10 at 58:5–59:21. Dr. Anderson testified that a chemist reading the Chatterjea & Prasad publication, even in 1981, would think that it describes nabumetone. Anderson, Day 7 at 71:7–21.

As late as January 1982, Beecham was resigned to the fact that the Chatterjea & Prasad publication identified nabumetone. As Mr. Stott told Mr. Doyle: "we cannot deny the actual disclosure of [nabumetone]" by the Chatterjea & Prasad publication. Exhibit 309 at 2. Indeed, Beecham maintained the belief that the Chatterjea & Prasad publication identified nabumetone *even after the patent was issued,* as indicated by Mr. Stott's June 3, 1983 memorandum to Dr. Mansford, expressing surprise that the examiner had allowed a patent "for a compound that is described in the prior art." Exhibit 373.

This evidence accords with Dr. Taylor's testimony that the ordinary chemist would understand the Chatterjea & Prasad publication to identify nabumetone. The contemporaneous laboratory notes and correspondence of Beecham employees, indicates that the scientists at Beecham immediately understood the Chatterjea & Prasad publication to describe precisely what it purports to describe: a four-step synthesis of nabumetone beginning with methoxy acetate. Furthermore, there is no dispute that, if one begins with authentic methoxy acetate and follows the sequence of reactions set forth in the text of the Chatterjea & Prasad publication, one will derive nabumetone. Indeed, Drs. Rose and Anderson and other Beecham chemists successfully synthesized nabumetone, beginning with methoxy acetate and following the process or method set forth in the Chatterjea & Prasad publication.

I am simply unpersuaded by the argument advanced by the plaintiffs that the Jones error precludes the identification of nabumetone by the Chatterjea & Prasad publication. As to that issue, I credit the testimony of Dr. Edward C. Taylor, the defendants' expert in synthetic organic chemistry.

a. *Dr. Taylor's Testimony.*

Dr. Taylor testified that a chemist of ordinary skill would not believe, simply by virtue of the footnote 19 reference to Jones, that the Chatterjea & Prasad publication either did not identify or mistakenly identified nabumetone. Instead, as Dr. Taylor testified, a chemist of ordinary skill would clearly understand from both the plain language of the article and from the purpose of the article, as expressed by the authors, that the Chatterjea & Prasad publication described nabumetone.

First, as noted earlier, the Chatterjea & Prasad publication clearly states the chemical name for nabumetone: $\Sigma\upsilon$–(2–methoxy–6–naphthyl) ethyl methyl ketone. Exhibit 13 at 218. Drs. Rose and Anderson, testified consistently with Dr. Taylor that this name unequivocally provides the structure of nabumetone to a chemist of ordinary skill. Rose, Day 10 at 58:22–59:5; Anderson, Day 5 at 6:2–8; Taylor, Day 1 at 101:25–102:15. In fact, as Dr. Taylor went on to testify, an ordinary chemist would know how to synthesize nabumetone simply by looking at the structure: "[t]his is a simple molecule, and the synthesis of this compound independent of anything else in the paper is really not a major challenge to a person of ordinary skill." Taylor, Day 1 at 102:19–22. Dr. Rose agreed that nabumetone was a "simple compound," for which there were "a number of synthetic routes." Rose, Day 11 at 51:11–15; 52:5–10. The Chatterjea & Prasad publication also references the "related methyl ether" of Compound XX, a hydroxy compound. Drs. Rose, Bartlett and Taylor agree that this description also unequivocally identifies nabumetone to a chemist of ordinary skill. Rose, Day 10 at 59:9–18; Bartlett, Day 15 at 131:23–132:12; Taylor, Day 2 at 62:14–63:4.

Second, as Dr. Taylor explained, given the objective of the authors' scientific investigation, the ordinary chemist would understand that the Chatterjea & Prasad publication described the synthesis of a series of methoxy, not hydroxy, compounds. As Dr. Taylor testified, "the objective of the [Chatterjea & Prasad] article" was to investigate the findings of an earlier pair of researchers, Miller and Robinson, by comparing one methyl ether to another. Taylor, Day 1 at 112:1–116:9; Day 2 at 10:4–12:2. Thus, an ordinary chemist would have understood that the Chatterjea & Prasad publication identified a methoxy, rather than a hydroxy, compound because the authors' purpose was to compare the compound they had identified to another methoxy compound: "[i]t's apples and oranges to compare a hydroxy with a methoxy, because they are simply different to start with." Taylor, Day 2 at 18:25–19:2. Although the authors of the Chatterjea & Prasad publication "could have compared the two hydroxy compounds, they chose not to;" instead "their strategy was clearly to compare the methyl ethers." Taylor, Day 2 at 20:15–18. In fact, "[t]here is not a mention of . . . any hydroxy compound being prepared in the experimental section [of the Chatterjea & Prasad publication], except for the preparation of compound XIX, which was immediately methylated to form the methoxy compound." Taylor, Day 2 at 60:21–25. Thus unlike the situation in *Application of Yale*, 58 C.C.P.A. 764, 434 F.2d 666, 668–69 (Cust. & Pat.App.1970), the person of ordi-

nary skill, reading the Chatterjea & Prasad publication, would not have any reason to dismiss the naming of nabumetone as a typographical error. Taylor, Day 2 at 62:14–20.

As to the impact of the Jones reference in footnote 19, Dr. Taylor testified that:

> the person of ordinary skill reading that would not take that as a certain indication that [Jones] was the method that Chatterjea & Prasad used. They could have, but when you look [the footnote] up it is a reference to a compound which is the starting material for the Chatterjea & Prasad synthesis, and there are a number of syntheses to that compound[.][M]aybe this is what they used. Maybe they didn't, but all I can say is it is not explicitly stated that they used it. So I think that is about as far as the person of ordinary skill can go in interpreting that footnote.

Taylor, Day 2, 28:18–29:3.[10]

If the person of ordinary skill in 1973 wished actually to synthesize nabumetone, Dr. Taylor explained, he or she would certainly read footnote 19, but the ordinary chemist "would fully realize that there is a good 25 years that's elapsed since the publication of . . . [the] reference in footnote 19," and would perform a literature search. Taylor, Day 2 at 31:13–25. Dr. Taylor expounded:

> They would certainly look for methoxy acid from which the methoxy acetate is made . . . They would look for methoxy

---

10. Dr. Taylor also suggested that one could interpret the footnote as a reference to the esterification step set forth in the Jones article, which "works fine for the conversion of authentic methoxy acid to authentic methoxy acetate." Taylor, Day 2 at 96:5–15. Indeed, as noted above, the 1976 laboratory notes of Beecham chemist Dr. Marton contain exactly such a notation—that is, a reference to Jones for the esterification procedure. Exhibit 427 at 17. Moreover, Beecham's November 3, 1976 progress report from the Chemical Development Department, which summarized the work of Drs. Marton and Rose, also included the citation to Jones for the esterification procedure. Exhibit 160 at 6. Dr. Rose confirmed that the Jones esterification procedure worked to convert methoxy acid to methoxy acetate. Rose, Day 10 at 108:17–20.

ethanol. They would look for ... methoxy bromide. That is if you are going to repeat the synthesis, you are going to see whether in that last 25 years any of these compounds along the synthetic pathway have been made, maybe by better procedures because the objective here ... is to synthesize the final compound. And if there is a shorter synthesis that one can carry out or a better one, by finding a better method for making one of these intermediates, that would be an obvious thing that a person of ordinary skill would do. So the person of ordinary skill would go to the literature, and he or she would certainly find a number of very interesting articles which dealt with the synthesis of methoxy acid and methoxy acetate, much more recent than the 1948 paper. Taylor, Day 2 at 32:2–19. As he summarized: "the major point here is that there are options for making the methoxy acetate ... which overcome this error in Jones which has been clearly recognized by a person of ordinary skill in 1973 reading the literature." Taylor, Day 2 at 36:12–16.

Importantly for purposes of this case, Dr. Taylor testified that if the person of ordinary skill chose an option other than Jones for making methoxy acetate, he or she would not have been changing the synthesis set forth in the Chatterjea & Prasad publication. Dr. Taylor explained: "Chatterjea & Prasad starts with methoxy acetate, reduces it to methoxy ethanol and converts that to methoxy bromide and so on. That is the synthetic method and synthetic route outlined by Chatterjea & Prasad, and ... since the entire article is predicated upon the synthesis of these methoxy compounds as we have already described, this is certainly following Chatterjea & Prasad." Taylor, Day 2 at 51:20–52:2. In other words, as Dr. Taylor later testified: "I disagree that the Jones proce-

dure is a part of the Chatterjea & Prasad paper. I mean this is a reference to a starting material and the method of making a starting material, and you might just as well have bought the compound from Aldrich [a chemical supplier] and considered that the synthetic made by Aldrich was a part of the synthetic procedure." Taylor, Day 2 at 57:24–58:5.

In short, Dr. Taylor testified that, for the ordinary chemist attempting to synthesize nabumetone in 1973 from the Chatterjea & Prasad publication, the impact of footnote 19 would have been "trivial." Taylor, Day 2 at 67:15–22. As he summarized, the person of ordinary skill would have to "do a number of ... very unusual things" to conclude that the sequence of reactions in the Chatterjea & Prasad publication was intended to lead to a hydroxy compound. The person of ordinary skill would have had to: depend on only one ambiguous reference even though it had been explicitly criticized and corrected in the literature; ignore the discussions on pages 215 and 218, which clearly state that the purpose of the paper was to compare two methoxy compounds; and fail to realize that comparing a hydroxy compound and a methoxy compound is meaningless. Dr. Taylor did not consider such a "fragmented" reading of the Chatterjea & Prasad publication to be typical of the person of ordinary skill. Taylor, Day 2 at 68:1–69:17.

Dr. Taylor's testimony about the minimal impact of the Jones reference is actually supported by some of the testimony of Dr. Rose. Although Dr. Rose had been aware of footnote 19 from the first time he read the Chatterjea & Prasad publication in January of 1975 (Rose, Day 10 at 67:9–22), he stated at trial that he did not question that the Chatterjea & Prasad publication contained a synthetic route to

nabumetone until the fall of 1976, when he began his experimental work and discovered the discrepancies in melting points. Rose, Day 10 at 91:18–93:20; Rose Day 11 at 47:21–49:17. Even at that point, however, he did not appear to believe that the Jones reference was an integral part of the Chatterjea & Prasad synthesis. In his November 2, 1976 memorandum to the Beecham Patent Department, he stated that he had prepared nabumetone "following the published methods as closely as detail would allow." Rose, Day 10 at 95:10–96:12; Exhibit 484 at 1. Although he had begun his experiment by esterifying methoxy acid to obtain methoxy acetate and although he recognized that his report to the Beecham Patent Department was an important one, he described his synthesis as beginning with methoxy acetate. Rose, Day 10 at 100:10–101:14. His memorandum of November 5, 1976 also reported the first step in the "published route" to nabumetone—meaning the Chatterjea & Prasad publication—as the conversion of methoxy acetate to methoxy ethanol. Rose, Day 10 at 101:15–103:16; Exhibit 483. Similarly, a report of the Chemical Development Department dated November 3, 1976 to Dr. Cole referred to "[a] preparation of [nabumetone] using the published route of Chatterjea and Prasad" that had been "requested by the Patent Department." Rose, Day 10 at 104:4–105:25; Exhibit 160 at 6.

By July of 1978, Dr. Rose testified, not only had he read the Jones article but also he was aware of Ormancey's findings. Rose, Day 11 at 4:23–6:16. He understood at that point that the first step of Jones' reported reaction would result in hydroxy acid rather than methoxy acid. Rose, Day 11 at 6:17–20. And yet, when he ran his second set of experiments, which he termed "Preparation of [Nabumetone] Literature Method," he began with the methoxy ethanol—the second step of the process outlined in the Chatterjea & Prasad publication—and proceeded from there to make nabumetone. Stipulated Facts ¶ 157; Rose Day 11 at 11:13–12:3; Exhibit 176 at 40–41. It is apparent then that, even as late as July 1978, Dr. Rose still did not believe the Jones reference to be an integral component of the procedure contained in the Chatterjea & Prasad publication.

Starting an outlined synthesis at an intermediate step, as Dr. Rose did in his second set of experiments, is not an unusual practice in synthetic organic chemistry. As Drs. Taylor, Rose and Bartlett all testified, it is perfectly acceptable to "jump in" to the middle of an outlined series of syntheses, if one has the appropriate intermediate compound. Taylor, Day 1 at 86:13–19; Day 2 at 65:20–66:7. Dr. Taylor analogized it as follows: "[I]f a friend gave you driving directions from Boston to Chicago [via] Cleveland, [and] you found yourself in Cleveland, in order to follow his directions from Cleveland to Chicago, you would [not] have to go back to Boston and start it there.... [I]t's much the same thing with respect to the synthetic sequence. You cut in where you can, in order to shorten the sequence, or to make it less expensive or to make it more convenient." Taylor, Day 1 at 86:20–87:3. Dr. Bartlett confirmed this by example: "if in 1985 the methoxy ethanol were commercially available, and I wanted to make ... nabumetone, then I could start with methoxy ethanol." Bartlett, Day 15 at 125:15–18.

Dr. Rose agreed that, if one were attempting to make a particular compound, one would try to have the "shortest route possible," if there were materials available to do so. Rose, Day 11 at 14:15–18. With regard to his July 1978 research, Dr. Rose testified that he began with methoxy ethanol because he had it available, and thus

did not need to go back to any previous stage. Rose, Day 11 at 14:2–10. This did not change his characterization of the experiment as a preparation of nabumetone by the "literature method."

In fact, in March 1979, Dr. Rose submitted the First Rose Declaration to the PTO, which included a statement that he had followed the Chatterjea & Prasad publication's method for synthesizing nabumetone and had diverged from that method *only* in that he had purified his compounds at each step. The synthesis described in the First Rose Declaration begins with methoxy acetate and does not refer to Jones in any way. Exhibit 33 at 2; Rose, Day 11 at 34:14–17. Instead, the thrust of the First Rose Declaration was to point out to the PTO the differences in melting points between the compounds Dr. Rose had synthesized and those reported in the Chatterjea & Prasad publication. Exhibit 33 at 5–6, ¶¶ 7–8. As Dr. Rose testified, it was the differences in melting points and not the Jones reference *per se* that caused Dr. Rose to conclude that Chatterjea & Prasad had created hydroxy rather than methoxy compounds. Rose, Day 11 at 49:8–17; Day 12 at 31:6–10.[11]

But as Dr. Taylor made clear at trial, the melting point issue is a red herring as far as what the ordinary chemist would have understood from the Chatterjea & Prasad publication in 1973. Dr. Taylor stated that the melting point data reported in the Chatterjea & Prasad publication "wouldn't have any influence whatsoever" because "as far as the person of ordinary skill is concerned, these are compounds which are being made presumably for the first time. Who knows what their melting points are[?] ... [O]ne doesn't ... pay any attention to them at all if one is simply reading the paper and seeing that these various compounds have been prepared in a very straightforward sequence of chemical reactions.... [T]here is no impact of melting points at that stage on the person of ordinary skill." Taylor, Day 2 at 30:9–25. Dr. Taylor clarified that the ordinary chemist in 1973 would not know what the melting points for the authentic methoxy compounds were, and therefore could make no comparison between those melting points and the melting points reported in the Chatterjea & Prasad publication. Taylor, Day 3 at 34:7–35:24. Drs. Anderson, Rose and Bartlett confirmed Dr. Taylor's assertion. Anderson, Day 5 at 34:23–35:10; Rose, Day 10 at 67:23–68:8; Bartlett, Day 16 at 8:6–18.

In contrast, the ordinary chemist would have the ability to evaluate the elemental analyses given in the Chatterjea & Prasad publication against the theoretical elemental analyses for the target compounds. Anderson, Day 5 at 35:11–16. As Dr. Anderson noted in his October 22, 1981 progress report, the ordinary chemist would see that the elemental analyses given by Chatterjea & Prasad "fit the methoxy compounds better [than the hydroxy compounds]." Anderson, Day 5 at 34:19–22; 35:11–20; Exhibit 270 at 3. Dr. Rose confirmed at trial that the elemental analyses reported in the Chatterjea & Prasad publication "were close to the theoretical values" for the methoxy compound series. Rose, Day 10 at 69:9–12. Dr. Anderson

---

11. Interestingly, when Dr. Marton obtained a melting point of 84°C for hydroxy acetate, which differed significantly from the melting point of 112°C reported in the literature reference (Khorana) for that compound, Dr. Rose did not appear to question the accuracy of the literature reference. Rose, Day 13 at 38:2–39:5, 61:17–23; Exhibit 19, M.L. Khorana and A.D. Pishawikar, Synthesis of $\Sigma\upsilon$–Naphthol Derivatives Part V: Derivatives of 2-hydroxy-3–naphthoic acid and 6–$\Sigma\upsilon$–hydroxy-naphthyl–alkyl acids, *The Indian Journal of Pharmacy*, at 297–301 (1961).

did not report elemental analyses when he did his experimental work; he knew that the elemental analyses for the hydroxy series of compounds would not match the elemental analyses reported in the Chatterjea & Prasad publication. Anderson, Day 5 at 53:3–54:14.

In contrast to the testimony of Dr. Taylor, I was not persuaded by the evidence on the identity of invention question presented by the plaintiffs. In the first place, the affidavits presented to the PTO by Drs. Rose and Anderson in 1983 were at odds with Beecham's initial understanding of the significance of the Chatterjea & Prasad publication. These affidavits were spun as part of a strategy by Beecham to overcome the impact of the Chatterjea & Prasad publication on the patentability of nabumetone. Indeed, as I have noted earlier, I have previously found that the affidavits contain material misrepresentations. Nor was I persuaded by the testimony at trial of Drs. Rose and Anderson. In addition to the material misrepresentations they made to the PTO, there are other reasons, discussed below, which affect my assessment of the credibility of their testimony. Furthermore, for reasons also explained below, I was not persuaded by Beecham's expert, Dr. Paul Bartlett.

b. *Dr. Anderson's Testimony.*

First, Dr. Anderson's assertions about what it means to follow a particular sequence of syntheses are undermined by his own actions. Critical to the plaintiffs' theory in this case is the claim that, in order precisely to repeat the syntheses in the Chatterjea and Prasad publication, one must create the starting material according to the Jones reference in footnote 19. Dr. Anderson testified that this was his belief. Anderson, Day 6 at 28:15–25. Jones itself contains a footnote after its starting material, referencing an article by Robinson and Rydon. Anderson, Day 6 at 29:12–30:6. However, when Dr. Anderson "followed" the Jones synthesis, he did not make the starting material according to the Robinson and Rydon reference. Anderson, Day 6 at 30:7–10. In other words, as he admitted, he did not "exactly repeat" the Jones procedure in the same way that he "exactly repeated" the Chatterjea & Prasad publication. Anderson, Day 6 at 31:8–23. Dr. Anderson stated: "I repeated [Jones'] procedure, but I didn't repeat the method by which he made his starting material."[12] Anderson, Day 6 at 36:2–4. Dr. Anderson's common-sense approach of not constantly reinventing the wheel in chemical experimentation is completely in accord both with Dr. Taylor's testimony about how an ordinary chemist would interpret footnote 19 and with the actual practice of Drs. Rose and Marton in performing their initial "repeats" of the Chatterjea & Prasad publication, the so-called "literature method." Beecham's current position, that this common-sense approach does not apply when one wishes to repeat the Chatterjea & Prasad publication, is not credible.

Second, Dr. Anderson's affidavit to the PTO was misleading with regard to his performing the Grignard reaction on hydroxy nitrile. While the Chatterjea & Prasad publication does not report which solvent was used to perform this reaction, Dr. Taylor testified that the "common solvent for a Grignard [reaction] is diethyl ether," and "a person of ordinary skill

---

12. Dr. Anderson did not repeat Jones' procedure in yet another way. Although in Jones' description of the Willgerodt reaction, Jones states that he refluxed his product for only twenty-four hours, Dr. Anderson instead refluxed for forty-six hours. He did not point out this difference to the PTO. Rather, he told the PTO only that he had performed an "exact repeat" of Jones. Anderson, Day 6 at 54:20–56:1; Exhibit 36 at 52.

seeing no solvent mentioned would conclude that diethyl ether was used" because "[u]sually, when one uses something other than diethyl ether, that is specified." Taylor, Day 2 at 22:7, 14–17. Dr. Anderson agreed that "anyone reading the [Chatterjea & Prasad] article and not seeing a solvent [for the Grignard reaction] would immediately use ether as the solvent." Anderson, Day 5 at 58:1–4.

Indeed, Dr. Anderson twice attempted to run the Grignard reaction on hydroxy nitrile using diethyl ether, but failed both times. Anderson, Day 5 at 61:7–15.[13] However, rather than informing the PTO that running the standard Grignard reaction on hydroxy nitrile, with the customary solvent, had failed, he reported instead, in his affidavit, that "it proved difficult to get the Grignard reaction to proceed in ether," a statement that he agreed on the stand was at least "a bit of a euphemism." Anderson, Day 5 at 62:13–24; Exhibit 349 at Appendix 3. His affidavit then informed the PTO that the reaction "worked" in THF, "although with some difficulty." Anderson, Day 5 at 71:21–72:2; Exhibit 349 at Appendix 3. This also was not strictly true. In fact, as Dr. Anderson acknowledged, he never was able to get the Grignard reaction to work with only THF as a solvent. Instead he eventually got the reaction to work only by adding a considerable amount of benzene, another solvent. Dr. Anderson admitted that he did not tell the PTO about the need to add benzene. Anderson, Day 5 at 72:3–73:22; 74:10–75:14. He testified that he had "no idea" why he did not include that information. Anderson, Day 9 at 42:19–23.

Since the premise of Dr. Anderson's affidavit to the PTO was that he had performed an "exact repeat" of the Chatterjea

& Prasad paper and had created a series of hydroxy compounds, his omission of these inconsistencies in method is not insignificant. In fact, at the time that Dr. Anderson signed his affidavit in November of 1982, he had been in possession of Mr. Prasad's thesis for almost a year, and was aware that Mr. Prasad actually had used ether to carry out his Grignard reaction. Anderson, Day 10 at 24:25–25:14; 27:1–8; Exhibit 36 at 61.

Third, there are issues with Appendix 4 to Dr. Anderson's affidavit, a chart that purports to compare melting points from Dr. Anderson's methoxy series, his hydroxy series, and the series of compounds reported in the Chatterjea & Prasad publication. As Dr. Anderson conceded, it would appear to the PTO, or to anyone reading the chart, that the melting points listed for the hydroxy series all came from one experiment. Anderson, Day 6 at 56:3–58:1. But, as Dr. Anderson admitted, in fact some of the melting points listed on Appendix 4 came from one experiment, while others came from a second experiment. Dr. Anderson denied that he was purposefully "mixing and matching" the figures, but stated that he could not explain why the figures from two experiments had been combined. Anderson, Day 6 at 47:2–52:1; 52:22–53:7; Exhibit 349 at Appendix 4; Exhibit 801; Exhibit 802.

Fourth, Dr. Anderson changed his testimony during the course of the trial with regard to the product of his fourth Grignard attempt. On direct examination, he testified that when he stated in Appendix 4 of his PTO affidavit that the melting point of the hydroxy ketone was "oil," he was not referring to the product of his fourth Grignard attempt, which had produced a

---

**13.** Dr. Anderson's inability to run a standard Grignard reaction on hydroxy nitrile confirms Dr. Taylor's testimony that such a reaction "will fail if one uses diethyl ether." Taylor, Day 3 at 19:17–19; Day 2 at 83:18–21.

"free-running liquid," but to either his third or fifth attempt, both of which had produced "a thick yellow oil that gradually solidified." Anderson, Day 6 at 59:13–63:13. He twice confirmed this testimony. Anderson, Day 6 at 67:20–68:1, 86:24–87:7. Later on direct examination, Dr. Anderson testified that the hydroxy ketone derivative (the "2, 4–DNP derivative"), for which he reported a melting point on Appendix 4, was derived from the "oil" he had reported in Appendix 4. Thus, upon comparing the melting points reported in his laboratory notebooks for his various Grignard attempts with the melting point for the 2, 4–DNP derivative reported in Appendix 4, he concluded that the "oil" referenced in Appendix 4 came from his third Grignard attempt. Anderson, Day 6 at 73:18–74:4. Dr. Anderson also testified that he could not recall whether he attempted to obtain a melting point for the hydroxy ketone oil once it had solidified; he later testified that he did not attempt to do so. Anderson, Day 6 at 77:16–23; 106:15–25.

Dr. Anderson then contradicted his earlier direct testimony, stating on cross-examination that the hydroxy ketone described as an oil in Appendix 4 of his affidavit "could be" the product of his *fourth* Grignard attempt. Anderson, Day 7 at 102:23–103:1. Also in contrast to his earlier testimony, he stated that he "wasn't *able* to obtain a melting point" for the hydroxy ketones that he made. Anderson, Day 8 at 41:22–25; 42:5–7; 43:7–8 (emphasis added). Putting aside for the moment the factual import of the testimony, I find that Dr. Anderson's visible discomfort and his easy willingness to recant on cross-examination testimony that he had previously confirmed more than

once on direct examination speak to his ultimate unreliability as a witness.

As Dr. Anderson affirmed at trial, his entire investigation of the Chatterjea & Prasad publication was undertaken "with the hope of providing new evidence proving that nabumetone was not obtained by Dr. Chatterjea and Mr. Prasad." Anderson, Day 5 at 6:9–22. "One of the purposes" of his affidavit to the PTO admittedly was "to show the patent examiner [that his] exact repeat of Chatterjea/Prasad supported the hydroxy acetate hypothesis." Anderson, Day 7 at 24:25–25:4. Dr. Anderson's testimony makes clear that he understood that his work was part of Beecham's overall strategy to persuade the PTO that the Chatterjea & Prasad publication did not describe nabumetone, and that he further understood that certain information might be presented or withheld in accordance with that strategy. For example, Dr. Anderson agreed that "the absence of any characterizing data, physical or spectroscopic in the Chatterjea/Prasad paper means ... that it is impossible to determine whether or not the thick pale yellow oil actually contained nabumetone," but, when asked whether this information should have been included in his affidavit, he answered only that he could not "recall ... the strategy behind the creation of the affidavit." Anderson, Day 7 at 25:5–26:6.

#### c. *Dr. Rose's Testimony*

The attempts of Dr. Rose, at trial, to distance himself from contemporaneous statements he made about his research and what I observed to be his obstinacy, evasiveness and occasional sophistry have led me to conclude overall that he was not a credible witness.[14]

---

14. Dr. Rose, of course, is a named inventor of nabumetone in the '639 patent. He is therefore more than just a disinterested observer— more even than merely a former employee of

Beecham. The fact is that the defendants in this case challenge a professional achievement—the invention of nabumetone—which

For example, Dr. Rose's testimony that he did not "repeat" the synthesis set forth in the Chatterjea & Prasad publication is not credible on its face. When performing the four-step synthesis from methoxy acetate to nabumetone in the fall of 1976, Dr. Rose actually termed his experiment a "repeat" of the Chatterjea & Prasad publication. In two November 1976 memoranda to members of the Beecham Patent Department, he stated that he had prepared nabumetone according to the "published methods" or "published route," and that he did so "as closely as detail would allow." Rose, Day 10 at 95:10–96:12; 101:19–103:16; Exhibit 484 at 1; Exhibit 483.

However, when asked at trial whether the person of ordinary skill in the art, who began with authentic methoxy acetate and followed the four reactions set forth in the Chatterjea & Prasad publication would produce nabumetone, Dr. Rose responded that such a person would produce nabumetone if he or she "followed the reactions that I outlined in *my* synthesis." Rose, Day 10 at 94:17–25 (emphasis added). When asked whether the reactions that he outlined were "based on a routine of" Chatterjea & Prasad, Dr. Rose responded: "They weren't a repeat. As I keep saying, they were similar reactions." Rose, Day 10 at 95:1–4. As he stated later, "if you were to use the authentic methoxy series, you would be following the Rose route, not the Chatterjea and Prasad route." Rose, Day 11 at 56:13–16.

Dr. Rose's testimony with regard to his 1978 series of experiments was similar. Although a July 13, 1978 memorandum to Dr. Cole states that he had "repeated the preparation of [nabumetone] using the route reported by Chatterjea/Prasad," (Exhibit 223), and his contemporaneous laboratory notebooks describe his experiment as "Preparation of [Nabumetone] Literature Method," (Exhibit 176 at 40–41), at trial Dr. Rose refused to acknowledge that the "literature method" to which he referred was that of the Chatterjea & Prasad publication. Rose, Day 11 at 7:12–10:23. Instead, he stated, the "literature method" may have referred to "my particular write-up by this point;" in other words, he stated, "one could ... take the view that the lit[erature] method was referring to what was by then published in the patent." Rose, Day 11 at 8:10–12; 10:2–4. After much discussion, Dr. Rose did acknowledge that "what [he had] written down there does say [he had] repeated the preparation [according to Chatterjea & Prasad]," although he continued to insist that it was not a "true repeat." Rose, Day 11 at 10:21–23. Asked to explain why, in several memoranda to the Beecham Patent Department, he had used the word "repeat," Dr. Rose stated that he had been "perhaps writing in loose language." [15] Rose, Day 11 at 11:1–12.

Yet it is evident, and indeed stipulated by the parties, that, beginning with authentic methoxy acetate, the four-step synthesis set forth in Example 19 of Beecham's patent application is the same as that set forth in the Chatterjea & Prasad publication. Stipulated Facts ¶¶ 100, 161. In fact, Dr. Rose testified that when he set out to repeat the Chatterjea & Prasad publication in the fall of 1976, he began with methoxy acetate; he grudgingly admitted that the same series of reactions set forth in the Chatterjea & Prasad publication were then put into the patent appli-

has been attributed to Dr. Rose for the last eighteen years.

**15.** The admission by Dr. Rose of the use of "loose language" in reports about scientific experimentation suggests either that Dr. Rose was an unreliable scientist or an unreliable witness.

cation as Example 19. Rose, Day 10 at 118:19–119:5.

Dr. Rose's testimony about the appearance of nabumetone as an oil is another example of his unreasonable pertinacity. He first confirmed that, in his experience, unpurified nabumetone appears as an oil, and that he understood that Ms. Gaster had also described impure nabumetone as "a pale yellow oil that solidified on standing." Rose, Day 11 at 20:5–16. Dr. Rose was reminded that the Chatterjea & Prasad publication described what the authors reported as the methoxy ketone as a "thick, pale yellow oil," and then was asked whether this was inconsistent with his own and Ms. Gaster's findings.

He first stated, "[w]e know that Chatterjea and Prasad did not and cannot have nabumetone in what they describe as their thick, pale yellow oil." Rose, Day 11 at 20:21–24. After an objection by the plaintiffs' counsel about the relevance of Dr. Chatterjea and Prasad's actual findings, Dr. Rose then stated, "Let me make it clear. I do not know what happen[ed] in their laboratory at all." Rose, Day 11 at 21:15–16. But immediately following this statement, when asked again whether the description in the Chatterjea & Prasad publication was inconsistent with Ms. Gaster's reported findings, Dr. Rose testified, "I am sorry, but knowing what Dr. Gaster had achieved and knowing what these authors have achieved, there isn't inconsistency in the sense that one has nabumetone and [the] India reported oil does not have nabumetone." Rose, Day 11 at 22:1–4.

When pressed further, Dr. Rose testified: "[j]ust reading thick, pale yellow oil, I do not associate it with nabumetone at all." Rose, Day 11 at 23:5–6. He then stated, "I don't see how it could be consistent [with nabumetone], knowing that nabumetone is a solid and crystalline."

Rose, Day 11 at 23:9–10. Reminded that he and Ms. Gaster had both produced nabumetone as an oil that solidified, Dr. Rose reverted to his argument that the oil reported in the Chatterjea & Prasad publication simply could not be nabumetone: "We know that it cannot be nabumetone.... It is not written down as a solid, so I just take it that it is an oil, and if it does crystallize or if it does solidify, it won't be nabumetone." Rose, Day 11 at 24:11–18. Finally, after this very lengthy exchange, Dr. Rose admitted that when he first saw the Chatterjea & Prasad publication and saw the description of thick, pale yellow oil, he believed there was "a possibility" that it could be nabumetone. Rose, Day 11 at 25:5–8.

Dr. Rose similarly hedged his testimony about his First Declaration to the PTO. He admitted that, according to both the Declaration itself and the simultaneous representations made by Beecham's attorneys to the PTO, the "only divergence" between his experimental work and that reported in the Chatterjea & Prasad publication was that he purified the product derived at each step. Rose, Day 11 at 35:9–13. He further admitted that his First Declaration did not include any reference to Jones. Rose, Day 11 at 34:14–17. But when asked whether he therefore did not consider the omission of Jones to be a divergence from the Chatterjea & Prasad published procedure, he replied: "You are confusing me. I don't see how inclusion of Jones or not is any divergence. All I am reporting is the experimental work and comparison between the two experimental works.... I find it difficult to understand your question." Rose, Day 11 at 35:14–24.

Yet another example of the tortured evidence offered by Dr. Rose is his testimony concerning the July 13, 1978 memorandum that he sent to Dr. Cole. The memorandum states: "if [nabumetone] is in the oil pre-

pared by the authors [Chatterjea & Prasad] at all, it must be present in low proportion." Exhibit 223. On examination by the plaintiffs' counsel, Dr. Rose had stated that as of September, 1976, he had reached the conclusion that Chatterjea & Prasad could not have produced nabumetone. Rose, Day 12 at 28:5–13. When defendants' counsel confronted him with the language from his July 13, 1978 memorandum, Dr. Rose first stated that he was being "very kind to Chatterjea and Prasad by making that conclusion." Rose, Day 13 at 32:3–19. When asked whether, in light of the .1978 memorandum, his earlier testimony was accurate, Dr. Rose stated that his testimony was accurate and "the 1978 document is probably not the accurate one." Rose, Day 13 at 36:14–19.

These examples are illustrative of the demeanor and attitude that made it difficult for me to credit Dr. Rose's testimony. In addition, as discussed earlier in this section, I found substantive problems with his testimony, particularly with regard to the inconsistencies between his views as expressed in documents contemporaneous with his research during the period of the patent prosecution and his position at trial. His attempts retroactively to explain earlier statements in a way consistent with Beecham's current position were generally unconvincing and at times transparently disingenuous.

d. *Dr. Bartlett's Testimony.*

Unlike Drs. Anderson and Rose, Dr. Bartlett was never a Beecham employee; he was instead an expert employed for the purpose of litigation. For the most part, Dr. Bartlett's testimony on scientific principles was non-controversial and confirmed that of Dr. Taylor and the other chemists. As to the ultimate issue in the case, however—the question of whether an ordinary chemist in 1973 would have believed that the Chatterjea & Prasad publication disclosed nabumetone, despite the Jones reference in footnote 19—I did not find his testimony persuasive. Dr. Bartlett's position was that a person of ordinary skill in the art who simply read the Chatterjea & Prasad publication, but did not experiment, would immediately believe that the article described a series of hydroxy, rather than methoxy compounds. Bartlett, Day 16 at 8:19–9:2. He admitted, however, that such a conclusion would be based only on the footnote reference to Jones and nothing else. Bartlett, Day 16 at 9:3–7. On this point, I credit, as I have said, Dr. Taylor's testimony that a person of ordinary skill in the art interpreting a scientific paper would not rely on a single, flawed reference in one footnote to the exclusion of the overall context and expressed purpose of the paper's text.

I also found difficult to credit Dr. Bartlett's assertion that "[s]omebody in possession of Chatterjea and Prasad ... has a harder time making nabumetone than if they had never seen the article." Bartlett, Day 16 at 49:14–16. Dr. Bartlett explained that, in contrast to the Chatterjea and Prasad publication, Beecham's 1973 British patent application, which provides no synthesis or characterizing data, did describe the invention of nabumetone because "[t]here is nothing in the Beecham patent application which detracts from the base of knowledge in the art of organic synthesis." Bartlett, Day 16 at 48:20–49:7; Exhibit 2. Essentially, Dr. Bartlett's testimony was that a reference that gives only the name of a compound describes that compound, but a reference that gives a name and a workable synthesis does not describe the compound. I simply do not accept this assertion in light of the record as a whole.

In addition, Dr. Bartlett drew a distinction between the description of "a struc-

ture as a conceptual item" and "a compound as a material." Bartlett, Day 16 at 51:6–9. Somewhat at odds with his testimony about Beecham's 1973 British patent application, Dr. Bartlett stated that, in order to describe a compound, one would need, in addition to the name or structure, "a method for producing [it] which is credible." Bartlett, Day 16 at 52:8–16. In other words, he testified, if a publication simply sets forth the name or structure of a compound, but nothing else, the publication would not describe the compound. Bartlett, Day 16 at 52:17–22. While I do not presume to pass judgment on this view as a matter of science, I note that it is contrary to established patent law, and for that reason, it cannot be accepted as a governing principle for the resolution of the identity issue raised in this case. *See, e.g., Donohue II, supra,* 766 F.2d at 533–34; *Samour, supra,* 571 F.2d at 563 n. 6 (a publication may disclose a compound if "a method of preparing it would have been known by, or would have been obvious to, one of ordinary skill in the art").

## 2. *Enablement*

Although Beecham argued non-enablement to the PTO, there does not now seem to be a dispute that the process set forth in the Chatterjea & Prasad publication, assuming an authentic starting material, will lead to nabumetone. As Dr. Taylor succinctly testified: "[the question is] will the synthesis work, and the answer is yes." Taylor, Day 1 at 110:7–8. Dr. Taylor explained: "[e]very one of those reactions is a standard one, which one learns even at the undergraduate level. The reduction of an ester to the ethanol, the formation of a bromide, formation of a nitrile, the Grignard reaction, these are well-known chemical transformations of which there are many, many precedents in the literature, so I think the person of ordinary skill would look at this synthetic scheme and

have no doubts whatsoever that it would be an operative sequence of reactions." Taylor, Day 1 at 110:14–23. Similarly, Dr. Anderson testified that he never "had any doubt that anyone of ordinary skill in the art after reading the article could make nabumetone," and that in fact, anyone with "chemical knowledge" could have worked out a process to get to nabumetone "as far back as 1893." Anderson, Day 7 at 68:17–69:7. Dr. Rose agreed that the reactions in the sequence were known as of 1973, and that when he read the Chatterjea & Prasad publication in 1975, he assumed that the reaction synthesis described would produce nabumetone. He confirmed that one of ordinary skill in the art would reach the same conclusion. Rose, Day 10 at 67:1–8; 70:15–23; Day 11 at 53:10–15.

In fact, even without this testimony, it would be clear that the four-step process set out in the Chatterjea & Prasad publication produces nabumetone, because it is identical to the four-step process that Beecham set forth in Example 19 to its patent application.

## 3. *Conclusion.*

In sum, I credit Dr. Taylor's testimony that it is not necessary for the ordinary chemist attempting to replicate a synthesis set forth in a scientific article to derive each of his or her starting materials only from a footnoted reference. This testimony, as noted earlier, actually is supported by that of Dr. Rose and by the evidence presented concerning the actual experimental practices of Drs. Rose and Marton. Thus, I conclude that the Chatterjea & Prasad publication described nabumetone to the ordinary chemist in 1973 and anticipated claim 4 of the '639 patent. This conclusion is supported by the Beecham chemists' initial response to and understanding of the Chatterjea & Prasad publi-

cation, which I find to be convincing evidence of how that publication actually was understood by chemists of ordinary skill in the art.

■■ As to Beecham's claims to nabumetone in solid form, I find that the fact that a compound, like nabumetone, is solid at room temperature is an inherent property of that compound. Taylor, Day 3 at 31:9–11. See Rose, Day 10 at 94:16 ("[a]fter purification, nabumetone is a solid"). Thus, the Chatterjea & Prasad publication anticipates claim 2 as well as claim 4 of the '639 patent. Prior art that discloses a compound that inherently possesses the claimed property is anticipatory even if the reference did not describe or reference that property. *Verdegaal Bros., Inc. v. Union Oil Co. of California*, 814 F.2d 628, 633 (Fed.Cir.1987), *cert. denied*, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987) (there is no "burden of proving" that any particular aspect or property alleged in the invention was "recognize[d]" at the time if it is "inherently possessed" by the prior art). *See also Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347 (Fed.Cir.1999) ("the discovery of a previously unappreciated property of a prior art composition ... does not render the old composition patentably new to the discoverer"); *In re Spada*, 911 F.2d 705, 708 (Fed.Cir.1990); *Donohue II, supra*, 766 F.2d at 534.

### B. *Unenforceability*

■■ Applicants for a United States patent are required to prosecute applications for the patent with candor, good faith and honesty. *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995); *see also* 37 C.F.R. § 1.56. A violation by the patent applicant of this duty of candor, good faith and honesty by the affirmative misrepresentation of a material fact to the PTO, the failure to disclose material information to the PTO, or the submission of false, material information to the PTO, with intent to deceive, constitutes inequitable conduct. *See Union Pacific Resources Company v. Chesapeake Energy Corporation*, 236 F.3d 684, 693 (Fed.Cir.2001); *Molins, supra*, 48 F.3d at 1178; *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). One who alleges such inequitable conduct must prove by clear and convincing evidence that the applicant knowingly misrepresented a material fact or knowingly submitted false material information to the PTO with intent to deceive. *See Union Pacific, supra; Kingsdown, supra*. A patent is unenforceable in its entirety if the challenger to the patent establishes by the requisite standard of proof that the applicant for the patent engaged in inequitable conduct, in relation to one or more of the patent claims, during the prosecution of the patent application. *See Kingsdown, supra*, 863 F.2d at 877.

■■ As stated above, I accepted the recommendations and conclusions of the special master as to the defendants' summary judgment motion on unenforceability. Thus, I have found two material misrepresentations: Dr. Rose's statement, in the Second Rose Declaration, that "had [he] not been in th[e] unusual position [of having the free acid with which to begin his experiment], [he] would have been obliged to prepare the required ... intermediate ... in accordance with ... [Jones], as indeed any independent expert would be obliged because the free acid was not and still is not generally available;" and Dr. Anderson's statement, in his Affidavit, that the melting point of hydroxy ketone was "oil." Exhibit 34 at 4; Exhibit 349 at Appendix 4.

I must now determine whether these misrepresentations were submitted to the

PTO by Beecham with intent to deceive. I may infer intent from the totality of the circumstances. *See Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1189–90 (Fed.Cir.1993) (" '[i]ntent need not, and rarely can, be proven by direct evidence,' " but "must generally be inferred from the facts and circumstances surrounding the applicant's overall conduct") (quoting *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed.Cir.1989)). A court may infer deceptive intent from submission of false statements to the PTO to overcome prior art. *Li Second Family Limited Partnership v. Toshiba Corp.*, 231 F.3d 1373 at 1381 (Fed.Cir.2000), *cert. denied,* ─── U.S. ───, 121 S.Ct. 2550, 150 L.Ed.2d 717 (2001). *See also Rohm & Haas Company v. Crystal Chemical Company*, 722 F.2d 1556, 1571 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984) ("submissions [of false statements in affidavits] usually will support the conclusion that the affidavit in which they were contained was the chosen instrument of an intentional scheme to deceive the PTO").

In addition, however, it is appropriate for me to look at Beecham's course of conduct throughout the entire patent prosecution for the discernment of any intent to deceive with respect to the specific misrepresentations at issue. *See Li Second Family, supra,* 231 F.3d at 1381; *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1320–21 (Fed.Cir. 2000); *Golden Valley Microwave Foods Inc. v. Weaver Popcorn Co.*, 837 F.Supp. 1444, 1471 (N.D.Ind.1992), *aff'd,* 11 F.3d 1072 (Fed.Cir.1993), *cert. denied,* 511 U.S. 1128, 114 S.Ct. 2136, 128 L.Ed.2d 865 (1994); *Merck, supra,* 873 F.2d at 1422.

Having heard all the evidence at trial, and having judged the demeanor and credibility of the witnesses presented, I conclude that there is clear and convincing evidence that Beecham's misrepresentations were intentional, and that therefore, the '639 patent is unenforceable on the grounds of inequitable conduct. I reach this conclusion in two steps. First, I have examined the testimony of Drs. Anderson and Rose with specific reference to the material misrepresentations they made to the PTO. Second, I have examined the record as a whole to determine, from the context of Beecham's actions throughout the patent prosecution, whether the material misrepresentations were inadvertent or deliberate.

1. *Testimony of Drs. Anderson and Rose.*

I accepted the special master's conclusion that Dr. Anderson's characterization of the melting point of his ketone as "oil" was a material misrepresentation. As the special master explained:

Dr. Anderson's declaration ... was offered to the Patent Office exactly on the point of whether or not the product made by Mr. Prasad was nabumetone. By not reporting the hydroxy analogue as a solid, which of course would have a melting point, Dr. Anderson was able to state that melting points he obtained by following the Jones method "exactly" corresponded with what was reported in Chatterjea & Prasad. Had he not reported this as an oil, he would have had one-third of the melting points not agreeing. He could not have then discounted the one melting point which was out of line. Then the entire basis of his affidavit would not have been useful.

Report and Recommendation of the Special Master on Defendants' Motion for Summary Judgement of Unenforceability at 29.

At trial, Dr. Anderson admitted that he did not tell the PTO that the hydroxy ketone product he reported as an "oil" in

Appendix 4 had solidified, even though by the time Appendix 4 was prepared, his experiment long since had been completed. Anderson, Day 6 at 63:16–64:4; 74:1–19. The parties have stipulated that Beecham knew, as of the date of Dr. Anderson's Affidavit, that pure hydroxy ketone is a solid with a melting point of approximately 120° C. Stipulated Facts ¶ 162. At one point in his direct examination Dr. Anderson also testified that he could not recall whether he attempted to obtain a melting point of his hydroxy ketone once the compound had solidified; later he testified that he did not attempt to do so. Anderson, Day 6 at 77:16–23; 106:15–25.

On the other hand, Dr. Anderson admitted that he was "intent on setting a melting point" for the nabumetone that he produced in his methoxy series, which he also initially reported in his laboratory notebook as a "pale brown oil which gradually solidified." Anderson, Day 6 at 103:12–105:8; Exhibit 36 at 91. Dr. Anderson initially attempted to explain the discrepancy in his treatment of the melting point problem by asserting that, in his methoxy series, "the sequence reactions that [he] was following was from the Rose declaration." When confronted with the language of his affidavit, however, he acknowledged that he had not made clear to the PTO that he had tried to set a melting point for the methoxy series, but not for the hydroxy series. Instead, he had told the PTO that he was exactly repeating the Chatterjea & Prasad sequence using authentic methoxy acetate. Anderson, Day 6 at 107:8–108:21; Exhibit 349 at 4, ¶ 5. There is no description in the Chatterjea & Prasad publication of crystallizing the ketone in order to set a melting point; Dr. Anderson admitted that crystallizing his methoxy ketone was therefore "an extra step" about which the PTO was not in-

formed. Anderson, Day 6 at 108:22–109:13. As noted above, Dr. Anderson's testimony on this issue caused him visible discomfort.

Dr. Rose also offered testimony in an attempt to explain the material misrepresentation in his Second Declaration. His Declaration stated that he "was in the unusual position" of having "the free acid" with which to begin the experiment, and that "had [he] not been in this unusual position, [he] would have been obliged to prepare the required ... intermediate ... in accordance with ... [Jones], as indeed any independent expert would be obliged because the free acid was not and still is not generally available." Exhibit 34 at 4.

Asked by the plaintiffs' counsel on direct why he would have been "obliged to prepare methoxy acetate in accordance with Jones," Dr. Rose responded: "If you want to find out exactly what Chatterjea and Prasad had prepared, you need to use the reference to find out what materials they had prepared to start with, and ... you do need to use the [Jones] reference." Rose, Day 12 at 111:18–25. He then stated, "You are obliged to use [Jones] to see exactly what they did." Rose, Day 12 at 113:1–2. Dr. Rose testified that it was not his intention to represent to the PTO that there were no other ways to make the acetate. Rose, Day 12 at 113:6–8. The Second Rose Declaration plainly states, however, that the reason Dr. Rose or any other expert would be "obliged to use" Jones is that the free acid "was not, and still is not, generally available." Dr. Rose's after-the-fact attempt to explain the "obliged to use" phrase as independent of the rest of the sentence simply is not believable.

Dr. Rose also testified that by the phrase "not generally available," he intended to mean "not commercially avail-

able." Rose, Day 12 at 115:23–116:7.[16] Upon questioning from the defendants' counsel, Dr. Rose again attempted to disassociate the "obliged to use" phrase from the "generally available" or "commercially available" phrase, but eventually was forced to admit that those two concepts in fact were "linked up" in his Second Declaration. Rose, Day 13 at 48:19–51:5. He stated that he could not "actually explain" why he had linked them originally. Rose, Day 13 at 51:9–14. Upon further questioning, Dr. Rose stated: "I didn't say that because the free acid is not commercially available, you have to use Jones. I said you have to use Jones to understand what Chatterjea and Prasad actually produced. If it's written down slightly different, then I apologize for that, but that is what I'm telling you now." Rose, Day 13 at 52:17–22. Dr. Rose's Second Declaration—a sworn statement submitted to the PTO—is not ambiguous, and there is more than a "slight difference" between the Declaration and his testimony at trial.

#### 2. *Additional Evidence Considered.*

#### a. *Other Misleading Statements in Affidavits Provided to the PTO.*

The First Rose Declaration also contains inaccuracies not fully discussed above. As described above, the declaration provided a table showing comparative melting point data between Dr. Rose's methoxy series and that reported in the Chatterjea & Prasad publication. For his own preparation of nabumetone, Dr. Rose listed a melting point of 80°C; for that of Chatterjea & Prasad, he listed "oil." He then listed a difference in melting points between the two compounds of greater than fifty de-

grees. Exhibit 33 at 5. The melting point for his own methoxy ketone compound had been calculated after crystallization. Dr. Rose acknowledged, however, that he had no idea whether the authors of the Chatterjea & Prasad publication had similarly crystallized their methoxy ketone compound. Rose, Day 11 at 40:20–41:1.

Dr. Rose explained at trial that, although the Chatterjea & Prasad publication had not listed a melting point, Dr. Rose "took the view that if the compound was pure, then it had a melting point below room temperature," and he "gave [Dr. Chatterjea] a room temperature in India of about 30 degrees centigrade," thus achieving the fifty degree difference. Rose, Day 11 at 37:25–38:4. He "expected" the PTO to understand his assumption that the compound reported in the Chatterjea & Prasad publication was pure, but he did not specifically inform the PTO of this assumption. Rose, Day 11 at 38:10–15; 41:5–12.

To the contrary, after the table in his First Declaration, Dr. Rose wrote the following: "From the above data I note that temperature differences of about 10°, 35°, –19° and >50° were obtained. These differences *could not have been due to purity differences in the samples . . .*" Exhibit 33 at 5 (emphasis added). The other temperature differences cited concerned the ethanol, bromide and nitrile samples, but Dr. Rose admitted that he included the greater than fifty degree difference in the nabumetone melting point as part of that statement. Rose, Day 11 at 41:13–42:5.

Asked at trial whether he knew at the time he made the statement that it was possible that the difference in melting

---

**16.** I note, as a preliminary matter, that the making by Dr. Rose, in 1983, of the categorical statement that the free acid was "not generally available" cannot be reconciled with what he was told seven years earlier by Dr. Goudie and Ms. Gaster. In a memorandum dated March 8, 1976, Dr. Goudie and Ms. Gaster told Dr. Rose that, "the starting ester [methoxy acetate] is readily available." Exhibit 127 at 1.

points for nabumetone in fact could have been due to purity differences, Dr. Rose first avoided the question, answering that the statement was true with regard to the three other samples. When the defendants' counsel asked him to focus only on the nabumetone sample, which was included within the statement, he stated: "We don't know what the purity of that oil is, so that could be quite accurate.... [W]e don't know whether it's pure or not." Rose, Day 11 at 42:19–20; 43:1–2. Asked whether it was true that he had not told the PTO that there was uncertainty about the purity of the nabumetone sample, Dr. Rose again avoided the issue, stating: "I gave the patent office a view of the difference in the melting point were that oil a pure compound. It doesn't alter the fact that the differences in the melting point in the other three compounds do make the statements later in my declaration correct." Rose, Day 11 at 43:3–12. I find that the statement Dr. Rose included after the data table in his First Declaration was inaccurate as to nabumetone—the compound at issue—and that he knew it to be so when he wrote it.

A draft of the Second Rose Declaration that was not submitted to the PTO raises additional issues. The "free acid," which Dr. Rose said in that Declaration was "not generally available," refers to methoxy acid, the precursor to methoxy acetate. Rose, Day 11 at 61:8–9. Not only was Dr. Rose aware of several references that taught how to make the methoxy acid (Rose, Day 11 at 61:13–16), but in fact the draft of the Second Rose Declaration made specific reference to Ormancey, one of those references. Rose, Day 11 at 62:11–63:2; Exhibit 439 at 4. That information was omitted from the final Declaration and thus never was submitted to the PTO. Rose, Day 11 at 63:3–6.

The next line of the draft, which stated: "I did not use the process described in the [Jones] publication, referred to in Chatterjea," also was omitted from the final version of the Second Rose Declaration. Rose, Day 11 at 63:12–18; Exhibit 439 at 4. A handwritten comment in the margin states: "Why not? Because he knew it wouldn't work." Rose, Day 11 at 63:19–22; Exhibit 439 at 4. Dr. Rose testified that he did not know who wrote the margin comment. Rose, Day 11 at 64:7–12. He further testified that he did not know why the revisions to the Declaration, (omitting the references to Ormancey and to Dr. Rose's having not followed Jones), were made. Rose, Day 11 at 63:7–11; 64:2–6. Even if Dr. Rose did not know *why* the revisions were made,[17] he did know that they *were* made. Given what Dr. Rose knew about why the Second Rose Declaration was required, he understood the significance of the omissions—omissions that concerned issues at the heart of his Second Declaration.

As discussed above in the section of this memorandum addressing identity, Dr. Anderson's Affidavit also was misleading with regard to his description of running the Grignard reaction on hydroxy nitrile. The plaintiffs have argued that I should reject what they describe as the "defendants' belated attempt to interject a new ... issue of inequitable conduct," specifically, this misleading representation by Dr. Anderson to the PTO. Beecham's Post–Trial Brief at 28. First, I note that Beecham had ample opportunity to examine Dr. Anderson at trial and appeared to be fully prepared with regard to this now-disputed issue. Second, and more importantly as a legal matter, I have not consid-

17. It is hard to imagine how the person who wrote the margin comment would have had that information without speaking to Dr. Rose or one of his colleagues.

ered the statements about the Grignard reaction in Dr. Anderson's affidavit to be additional, independent misrepresentations *per se.* I simply have evaluated them as part of the overall context by which I have determined that the two material misrepresentations in question were intentional. In other words, while I have made no specific finding that Dr. Anderson's statements were material misrepresentations, I may infer from them, in combination with other inconsistencies that appear in the record, that the material misrepresentations Beecham made to the PTO were made intentionally rather than inadvertently.

b. *Beecham's Lengthy Delay in Fully Disclosing the Chatterjea & Prasad Publication to the PTO.*

Beecham's initial patent application with claims to nabumetone was filed in August 1974. Beecham learned about the Chatterjea & Prasad publication in late December 1974 or early January 1975. Beecham believed, up to at least November 1976, that it was not entitled to patent protection for nabumetone, because the compound had been disclosed in the Chatterjea & Prasad publication. Beecham mentioned the article to the PTO for the first time in August 1975, but told the PTO that compound XIX, the hydroxy analog of the position isomer of nabumetone, was "most pertinent" to the claim made by Beecham for nabumetone. Exhibit 11 at 63 (Bates Stamp page number 185006). It does not appear that Beecham provided the PTO with a copy of the Chatterjea & Prasad publication at that time.

Indeed, Beecham did not provide the PTO with a copy of the Chatterjea & Prasad publication until February 1977, after Dr. Rose had completed his first set of experiments and purported to question whether Chatterjea & Prasad actually had synthesized nabumetone. Even at that time, Beecham attempted to distract the examiner by referring him to the hydroxy analog of nabumetone and not to nabumetone itself. Exhibit 11 at 140, 144 (Bates Stamp page number 185081, 185085). Beecham did not tell the examiner that it believed that the Chatterjea & Prasad publication disclosed nabumetone until March 4, 1977, over two years after Beecham first discovered the publication. Exhibit 11 at 138 (Bates Stamp page number 185079).

c. *Other Misleading Information About the Chatterjea & Prasad Publication Provided to the PTO.*

When it finally disclosed the Chatterjea & Prasad publication to the PTO on March 4, 1977, Beecham told the PTO that it did not believe there was "a sufficient enabling disclosure in that brief description in the reference to enable one of ordinary skill in the art to produce the compound." Exhibit 11 at 138 (Bates Stamp page number 185079). However, in the fall of 1976, Dr. Rose had synthesized nabumetone and had described his work as "following the published methods as closely as detail would allow." Exhibit 484 at 1. Likewise, in October 1977, one of Beecham's patent agents wrote that "the process which Chatterjea & Prasad described does lead to [nabumetone] when repeated." Exhibit 198.

In March 1978, Beecham told the PTO that Chatterjea & Prasad "obtained a thick, pale yellow oil having a melting point of 184° to 186°." Exhibit 6 at 68. In fact, there is no description in the Chatterjea & Prasad publication of crystallizing the ketone to set a melting point, and the authors do not report a melting point for the oil. Anderson, Day 6 at 108:22–109:13; Rose, Day 11 at 40:20–41:1; Exhibit 13 at 218. It is the 2, 4–DNP derivative for

which the authors report a melting point of 184° to 186°. Beecham's assertion to the PTO that the oil reported by Chatterjea & Prasad as a methoxy ketone had a melting point of 184° to 186° is therefore a misrepresentation of the information contained in the Chatterjea & Prasad publication. Beecham made this misrepresentation twice on the same page of its communication with the PTO, using the representation to bolster Beecham's argument that Chatterjea & Prasad had not obtained nabumetone. Exhibit 6 at 68. Beecham stated, "[nabumetone is] crystalline ... [with] a melting point of approximately 80°C," in contrast to "the material of Chatterjea, et al. which is a thick pale yellow oil ... *[with] a melting point of 184° to 186°.*" *Id.*

Beecham also told the PTO in March 1978 that "[d]uplication of the Chatterjea disclosure confirms the fact that Chatterjea did not obtain the 6–methoxy compound of the instant case, but rather obtained the *6–hydroxy* compound." Exhibit 6 at 68 (emphasis in original). And yet, as of March 1978, Beecham had not successfully synthesized hydroxy ketone according to the four-step process in the Chatterjea & Prasad publication and believed that what Dr. Chatterjea and Mr. Prasad actually produced was "still uncertain." Rose, Day 12 at 88:1–89:4; Anderson, Day 6 at 32:15–20; Exhibit 434 at 2; Exhibit 160 at 7; Exhibit 221. Indeed, Beecham was not able to synthesize hydroxy ketone according to the four-step process in the Chatterjea & Prasad publication until Dr. Anderson's December 15, 1981 experiment. Day 6 at 8:17–15:8; Exhibit 36 at 62–63; Exhibit 802. Even then, as noted earlier, he synthesized the hydroxy ketone only by modifying the standard Gringhard reaction.

On May 3, 1983, Beecham told the PTO that, Dr. Chatterjea had taken a "fresh look at the synthesis with particular emphasis on the preparation of the starting material," and provided an affidavit from Dr. Chatterjea stating that he had "replicated the Chatterjea/Prasad synthesis and obtained a product which was ... the 2, 4–DNP derivative of the ... 2–hydroxy compound." Exhibit 8 at 91, 97. But Beecham did not tell the PTO that, after its initial request to Dr. Chatterjea that he repeat his work, Dr. Chatterjea informed Beecham that he had taken a "fresh look," repeated the synthetic route "with care," and had "synthesized the methyl ketone."[18] Exhibit 331 at 1–2. Nor did Beecham tell the PTO that Beecham had then specifically and emphatically urged that Dr. Chatterjea repeat the synthesis following both steps of the Jones reference, and that it had represented to Dr. Chatterjea that this request, while "artificial," was "required" by the PTO itself. Exhibit 333 at 1; Exhibit 335. There is no evidence that the PTO imposed this requirement.

### 3. *Conclusion.*

As set forth above, having found that Beecham made two material misrepresentations to the PTO, I reviewed both the specific testimony related to those misrepresentations and the evidence as a whole, to evaluate whether the misrepresentations were made intentionally.

The testimony of Drs. Anderson and Rose, which plainly was intended to show that their material misrepresentations were not intentional, in fact had the opposite effect. I found the testimony of these two witnesses as to the specific misrepresentations in their sworn statements to be

---

18. Thus, the result of the "fresh look" Beecham described to the PTO on May 3, 1983 was not the result of the "fresh look" Dr. Chatterjea described to Beecham.

inconsistent, evasive and, many times, implausible.

Furthermore, when Beecham's representations to the PTO, including the sworn statements of Drs. Rose and Anderson, are seen in the context of Beecham's internal communications, its research conclusions, and its correspondence, it is clear that Beecham engaged in a pattern of misrepresenting information to or, at the least, withholding information from the PTO. The striking disparity between what Beecham employees and agents were saying to each other and what they were saying to the PTO is epitomized by the two-year delay between Beecham's learning of the Chatterjea & Prasad publication and its full disclosure of that publication to the PTO. When it became aware of the Chatterjea & Prasad publication, Beecham immediately concluded that nabumetone was not a "unique Beecham compound," as it had been disclosed by that publication. *See, e.g.,* Exhibit 94. And yet, it was not until two years later that Beecham gave a copy of the Chatterjea & Prasad publication to the PTO and informed the examiner that the publication actually named nabumetone.

Moreover, Beecham's internal understanding that the Chatterjea & Prasad publication disclosed nabumetone appears to have remained unchanged throughout the prosecution of the various applications that led to the issuance of the '639 patent. Indeed, as I pointed out earlier, when the '639 patent finally issued, a satisfied, but surprised, Mr. Stott told his Beecham colleague, Dr. Mansford: "The Examiner's decision is completely unexpected. . . . It would appear that this is the first time a patent has been allowed in the U.S.A. for a compound that is described in the prior art under these circumstances." Exhibit 373. Mr. Stott's memorandum makes clear that, while Beecham was attempting to persuade the PTO that nabumetone had not been described by the Chatterjea & Prasad publication, high-level members of its Patent Department simultaneously believed the opposite. I read Mr. Stott's memorandum as an acknowledgment by Beecham that it had "put one over on" the PTO.

I find that Beecham engaged in a pattern of misrepresentation in its dealings with the PTO so pervasive as to negate any possibility that Beecham's misrepresentations to the PTO were inadvertent "loose language" or otherwise negligently made. Such a pattern bespeaks only deliberate dissembling by Beecham. Accordingly, I find by clear and convincing evidence that the defendants have established their contention that the '639 patent is unenforceable by reason of Beecham's inequitable conduct during the prosecution of the applications that led to the patent.

## C. *Attorneys' Fees.*

The defendants assert that Beecham's inequitable conduct makes this an exceptional case under 35 U.S.C. § 285 and request attorneys' fees pursuant to the statute. The defendants make this assertion in one sentence and do not set forth any supporting argument to justify their contention. Thus, I decline to address the issue of attorneys' fees. *See King v. Town of Hanover,* 116 F.3d 965, 970 (1st Cir. 1997) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (quoting *Willhauck v. Halpin,* 953 F.2d 689, 700 (1st Cir.1991)).

## IV. *Order for Judgment*

For the foregoing reasons, the clerk is directed to enter judgment for the defendants as follows:

1. Judgment for the defendants on their claim that the '639 patent is invalid; and

2. Judgment for the defendants on their claim that the '639 patent is unenforceable.

SO ORDERED.